Ruth PANTER et al.,
Plaintiffs-Appellants,

v.

MARSHALL FIELD & CO. et al.,
Defendants-Appellees.
Richard WEISS et al., Plaintiffs-
Appellants,

v.

MARSHALL FIELD & CO.,
Defendants-Appellees.

Nos. 80–1375, 80–1389.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1980.

Decided April 2, 1981.

Rehearing and Rehearing En Banc
Denied July 6, 1981.

Alan L. Unikel, Rosenberg, Savner & Unikel, Chicago, Ill. (Harry A. Young, Jr., Bilandic, Neisten, Richman, Hauslinger & Young, Ltd., Arthur T. Susman, Prins, Flamm & Susman, Ltd., Chicago, Ill., Donald L. Weinsberg, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., Robert S. Atkins, Freeman, Atkins & Coleman, Ltd., Lawrence H. Eiger, Much, Shelist, Freed, Denenberg, Ament & Eiger, P. C., Chicago, Ill., on Brief) for plaintiffs-appellants in No. 80–1375;

Irwin Panter, Panter Nelson & Bernfield, Chicago, Ill., for plaintiffs-appellants in No. 80–1389".

Lowell E. Sachnoff, Bryson P. Burnham, Mayer, Brown & Platt, Chicago, Ill., for defendants-appellees.

Before PELL and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.\*

PELL, Circuit Judge.

The nineteen named plaintiffs in these consolidated cases appeal from a judgment of the district court which granted the defendants' motion for a directed verdict at the close of the plaintiffs' presentation of evidence to the jury. *Panter v. Marshall Field & Co.*, 486 F.Supp. 1168 (N.D.Ill.1980). The plaintiffs, shareholders of Marshall Field & Company (Field's) sought to prove that the defendants, the company and its directors, had wrongfully deprived the plaintiffs of an opportunity to dispose of their shares at a substantial premium over market when the defendants successfully fended off a takeover attempt by Carter Hawley Hale (CHH), a national retail chain. The plaintiffs claimed relief under federal securities law and state corporation and tort law. The district court found the evidence insufficient to go to the jury of the federal law claims and, exercising its pen-

dent jurisdiction, similarly found the evidence insufficient on the state law claims.

## I. STATEMENT OF THE CASE

A thorough and accurate summary of the facts was presented in the opinion of the district court. However, because the posture of the case requires determination of whether the facts established by the plaintiffs provide a sufficient basis for a jury verdict, we review them in some detail here.

### A. *The Parties.*

The named plaintiffs in the cases consolidated for trial were nineteen shareholders of Field's. On June 30, 1978, the plaintiffs were certified as class representatives of all persons who held Field's common stock at any time between December 12, 1977, and February 22, 1978. The plaintiff class was subdivided into four subclasses. Subclass I included all persons who held Field's stock on or before December 12, 1977, but disposed of it before February 22, 1978. Subclass II included all persons who acquired Field's stock after December 12, 1977, and disposed of it before February 22, 1978. Subclass III included all persons who acquired Field's stock after December 12, 1977, and did not dispose of it before February 22, 1978. Subclass IV included all persons who held Field's stock on or before December 12, 1977, and did not dispose of it before February 22, 1978.

Field's is a Delaware corporation with its principal office in Chicago, Illinois. The company has been engaged in the operation of retail department stores since 1852, and on December 12, 1977, it was the eighth largest department store chain in the United States, with thirty-one stores. Fifteen of the stores were located in the Chicago area: they included the State Street and Water Tower Place Stores in Chicago, the Oakbrook Store in west suburban Chicago, and the Old Orchard and Hawthorn Center Stores in north suburban Chicago. Other divisions included the Frederick & Nelson division in the state of Washington; the Halle Division of Halle Brothers Company in Ohio and Pennsylvania; and the Crescent

---

\* Edward Dumbauld, Senior Judge of the United States District Court for Western Pennsylvania, is sitting by designation.

Division of Halle with stores in Spokane, Washington.

The ten directors of Marshall Field & Company during the period from December 12, 1977 to February 22, 1978 are also named as defendants. Seven of the directors were not affiliated with Field's management; the remaining three were officers of Field's.

CHH is a California corporation engaged in the operation of retail department, specialty, and book stores. It was not a party here, although its efforts to acquire Field's gave rise to this litigation. CHH's Neiman-Marcus division operates retail stores in Texas and the southeastern United States. As of December 12, 1977, it had one store in Northbrook Court in north suburban Chicago. CHH also had acquired land on North Michigan Avenue, one block south of Field's Water Tower Place Store, and had expressed its intent to put a Neiman-Marcus Store there, although those plans were in abeyance during the relevant time period. CHH had also been attempting for some time to enter the Oakbrook Shopping Center in west suburban Chicago where Field's already had a store. Other divisions of CHH had department or specialty stores in the western United States. Its Walden Book division operated 433 book stores across the United States. In December 1977 Walden was the third or fourth largest bookseller in the Chicago market.

B. *The Pre-1977 Events.*

On several occasions in the late 1960's and continuing to the mid-1970's, Field's management was approached by would-be merger or takeover suitors. In 1969 Field's sought the help of Joseph H. Flom, an attorney with expertise in such matters, in determining how best to respond to the overtures of interested parties. Flom advised the board that the interest of the shareholders was the paramount concern, and that management should listen to such proposals, evaluate whether the proposal was serious, and whether the proposal raised questions of antitrust violations. He also advised Field's directors and management to invest the company's reserves and use its borrowing power to acquire other stores, if such acquisitions were in accord with the sound business judgment of the board, and in the best interest of the company and its shareholders. He counseled that such acquisitions were a legal way of coping with unfriendly takeover attempts.

Flom's advice was followed during this period in conjunction with a series of tentative approaches to Field's by or on behalf of potential acquirors. Thus, when in 1969 a third party interested in acting as a "catalyst" for a Field's-Associated Dry Goods merger approached the board, it considered the matter and rejected further exploration. While this offer was under consideration, Field's acquired Halle Brothers, a retailer with stores in communities in which Associated already had stores.

In 1975, investment bankers representing Federated Department Stores, then the nation's largest department store chain, approached Field's about a possible merger. Again, the Field's board considered the matter, but in light of advice of counsel that it would raise antitrust problems and damage the chances of a proposed Field's acquisition of the Wanamaker Company, the board determined not to pursue the contact.

Two approaches were initiated in 1976. In August, Dayton-Hudson, a large national department store, expressed interest in a possible merger. Field's management drew up a thorough list of options covering the advantages and disadvantages of such a merger. After reviewing that statement, Field's board decided that in light of their plans for future development and financial projections for 1977, a merger would not be advisable.

In September of 1976 Field's management received an inquiry from a third party asking whether Field's was interested in having Gamble-Skogmo, another national retailer, acquire a twenty percent block of Field's stock to "prevent a takeover by another party." Again the proposal was evaluated by Field's directors and turned down.

C. *The CHH Approach.*

In 1977 the Field's board decided to hire Angelo Arena, then head of CHH's Neiman-Marcus division, to commence employment

with the company in 1977, work with its current president, Joseph Burnham, for two or three years, and then assume the presidency of Field's on Burnham's retirement. However, when Burnham died unexpectedly in October of 1977, the Field's board determined, in an emergency meeting held three days after Burnham's death, to elect Arena to the presidency immediately and ask him to come to Chicago earlier than originally planned. In the three day interval CHH made informal contacts with intermediaries and expressed an interest in merging with Field's. The board was informed of those contacts at the October 13 meeting and resolved at that time not to consider the merger.

CHH continued to press its attentions however, and on November 16, Arena asked Field's antitrust counsel, the Chicago law firm of Kirkland & Ellis, to investigate the antitrust aspects of such a merger. Field's board met the next day, and authorized Arena and George Rinder, another director and Field's executive, to meet with representatives of CHH. That meeting took place the next day. The CHH team expressed their reasons why a merger would be good for both companies, and noted that a foreign firm was likely to make a $60.00 tender offer for Field's at any time. Field's representatives conveyed the board's position that internal expansion would be best for Field's, and expressed concern about antitrust problems of such a merger. CHH responded that their counsel had opined that there was no antitrust deterrent to the merger. Field's representatives agreed to report the discussions to the Field's board.

On December 2, Hammond Chaffetz of the Kirkland firm advised Field's management that in the opinion of Kirkland & Ellis the proposed combination would be illegal under the antitrust laws in light of (a) the existing competition between Field's stores and the Northbrook Neiman-Marcus store; (b) the potential competition between Field's Chicago stores and the Chicago stores Neiman-Marcus was planning to open; and (c) the existing competition between Field's stores (second in book sales in Chicago) and the stores operated by CHH's Walden division. Chaffetz' opinion was conveyed to Field's directors.

On December 10, Philip Hawley, the president and chief executive officer of CHH, called Arena and told him that unless Field's directors agreed to begin merger negotiations by the following Monday, December 12, he would make a public exchange proposal. He told Arena that CHH would propose beginning negotiations with an offer that for each share of Field's common stock CHH would exchange a number of its shares roughly equivalent to $36.00. Arena refused to enter such negotiations. Field's shares were trading on the market at around $22.00 per share on the Friday before Hawley delivered his ultimatum.

Arena construed Hawley's call as the beginning of an unfriendly takeover attempt by CHH. He contacted Flom, and arranged a meeting of key Field's directors, counsel, and investment bankers for the next day. At the meeting Arena reported the Kirkland & Ellis opinion. It was agreed to poll the absent directors for authorization to file a suit seeking resolution of the antitrust issues posed by the merger proposal. The group also determined to inform the New York Stock Exchange, and to call an emergency meeting of the Field's board for December 13.

On Monday, December 12, 1977, the CHH letter was received. Arena contacted all Field's directors but one by telephone, and they authorized the filing of the antitrust suit.

The special meeting of the board took place the next day with all members present. Also at the meeting were Field's attorneys and investment bankers. The lawyers, particularly Chaffetz, opined on the lack of legality of the merger, and the investment bankers evaluated the financial aspects of the merger. Field's management then made a report and projected that the company's future performance would be generally favorable. Many of the directors agreed with the investment bankers that a share of common stock would bring more than $36.00 in a sale of control of the com-

pany. After consideration of the above factors the directors voted unanimously to reject the proposal because in their judgment the merger as proposed would be "illegal, inadequate, and not in the best interests of Marshall Field & Company, its stockholders and the communities which it serves."

The directors also authorized issuance of a press release conveying their decision. On December 14, Field's issued the press release, which indicated that Field's directors and management had faith in the momentum of the company, and that "it would be in the best interests of our stockholders, customers and employees for us to take advantage of this momentum and continue to implement our growth plans as an independent company." Field's shares traded in the market in a range of $28.00 to $32.00 that day, and continued in approximately that range until January 31, 1978.

On December 20, 1977, Arena addressed a letter to Field's stockholders in which he spoke optimistically of the future and reviewed Field's immediate past performance. He pointed out that Field's had disposed of unprofitable ventures, and that "for the nine months ended October 31, income before ventures and taxes was up 24.4% and consolidated net income was up 13%." He referred to the CHH proposal for negotiation and to the advice of antitrust counsel "that a CHH-Marshall Field & Company merger would clearly violate the United States antitrust laws," and concluded that "[y]our Board of Directors believes the maximum benefits for Marshall Field & Company and its stockholders, employees, customers and the communities it serves will result from continuing to develop as an independent, publicly-owned Company."

On January 5, 1978, Field's issued another press release, announcing that it had amended its antitrust suit against CHH to include allegations of federal securities law violations. The release reiterated Field's confidence in its future, and stated "our management is continuing the implementation of our longstanding programs to further build and develop the business of Marshall Field & Company."

On January 19, 1978, Field's directors had their regular meeting. Two expansion proposals were on the agenda: one that the company expand into the Galleria, a Houston shopping mall where a planned Bonwit Teller store had failed to materialize, creating an attractive opening; the other that the company acquire a group of five Liberty House stores in the Pacific Northwest. The Galleria already contained a CHH Neiman-Marcus store. The board resolved to pursue both expansion programs. Field's executives and directors had long considered expansion into these two areas, and the company's interest in such expansion was well known to investment analysts in the department store field.

On February 1, CHH announced its intention to make an exchange offer of $42.00 in a combination of cash and CHH stock for each share of Field's stock tendered. The offer was conditioned on the fulfillment or non-occurrence of some twenty conditions. Appropriate documents for announcement of a tender offer were filed with the SEC. The market price of Field's stock rose to $34.00 per share, and stayed in the $30.00 to $34.00 range until February 22, 1978.

A special meeting of the Field's board was convened the next day to consider the new offer. The legal implications of the CHH filing were explained to the board by counsel, and Chaffetz brought the group up to date on the antitrust suit. There was no discussion of the adequacy of the offer in light of the board's determination that the proposed combination would clearly be illegal. The board also determined to go ahead with the Galleria plan, and approved the signing of a letter of agreement to enter the mall.

After the meeting Field's issued another press release reaffirming its opposition to the proposed merger. It concluded with a statement by Arena that "I assumed my position with Marshall Field & Company with the understanding that I would devote myself to making Marshall Field & Company a truly national retail business organization. We ... are determined not to be deterred from this course. Our recently

announced agreement to acquire five Liberty House Stores in Tacoma, Washington and Portland, Oregon was one step in our program."

On February 8, another Field's press release announced that Field's had concluded negotiations for a department store to be opened in the Galleria. On February 22, CHH announced that it was withdrawing its proposed tender offer before it became effective, because "the expansion program announced by Marshall Field since February 1st has created sufficient doubt about Marshall Field's earning potential to make the offer no longer in the best interests of Carter Hawley Hale's shareholders." None of the events that conditioned CHH's tender offer had occurred since February 1. Following the announcement, the market price of Field's shares dropped to $19.00, lower than it had been on December 9, the last trading day prior to CHH's first proposed offer.

## II. THE STANDARD OF REVIEW

■ We note as a preliminary matter that it is well settled that if the result below is correct it must be affirmed, although the lower court relied on a wrong ground or gave a wrong reason. *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937); *Barrett v. Baylor*, 457 F.2d 119, 122 (7th Cir. 1972).

A. *All the Evidence Should Be Considered on a Motion for Directed Verdict.*

■ In reviewing a district court's grant of a motion for directed verdict, the standard to be applied by the court of appeals is the same as that applied by the trial court. 5A Moore's Federal Practice ¶ 50.07[2] at 50–82 to –83 (2d ed. 1977); *see C-Suzanne Beauty Salon, Ltd. v. General Insurance Co.*, 574 F.2d 106, 112 n.10 (2d Cir. 1978). That standard, which has long been settled in this circuit, was most recently enunciated in *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980):

[I]t is our task to determine whether there is *substantial* evidence to support [appellant's] claim and upon which evidence a jury could properly have found in favor of [appellant] .... This standard ... requires this Court to view *all* of the evidence in the light most favorable to [the appellant].

*Id.* at 430 (Emphasis added. Citations omitted.); *accord, Hannigan v. Sears, Roebuck & Co.*, 410 F.2d 285, 288 (7th Cir.), *cert. denied*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969). Both the *Chillicothe* and *Hannigan* expressions of the rule reflect the requirement that the evidence, taken as a whole, provide a sufficient probative basis upon which a jury could reasonably reach a verdict, without "speculation over legally unfounded claims." *Brady v. Southern Railway*, 320 U.S. 476, 480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

Thus, in *Hohmann v. Packard Instrument Co.*, 471 F.2d 815 (7th Cir. 1973), this court upheld the grant of a directed verdict in a suit brought under SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1980), finding that the defendant's failure to disclose its purpose to abandon the product accounting for two-thirds of its sales pursuant to a long-planned but undisclosed model changeover was not misleading, and that the plaintiffs had failed to provide a foundation of fact sufficient to sustain their burden of proof. In a thoughtful opinion, Judge Hastings reviewed the standards for ruling on a motion for directed verdict, and concluded that the role of the appellate court in the directed verdict determination is "to evaluate the evidence to determine whether it is of sufficient probative value that members of the jury might fairly and impartially differ as to the inferences to be reasonably drawn therefrom." *Id.* at 820.

Although we view, in the present situation, the evidence in the most favorable light to appellants, on the other hand it is not the rule in this circuit that only testimony elicited on direct examination may be considered in a motion for directed verdict. As the *Hannigan* and *Chillicothe* courts acknowledged, the court must consider, ever

mindful that it must do so in the light most favorable to the non-moving party, *all* the evidence in determining whether there is enough to create a jury question. As we pointed out in *Brunner v. Minneapolis, St. Paul & Sault Ste. Marie Railroad,* 240 F.2d 608 (7th Cir. 1957), "[u]nder well established rules, plaintiff is entitled to have the credible evidence considered in the light most favorable to her. *However, this does not mean that we may ignore uncontradicted, unimpeached evidence supporting defendants' position.*" *Id.* at 609 (emphasis added).

B. *The Grant of a Directed Verdict May Be Appropriate in a Trial Where Motive and Good Faith Have Been Placed in Issue.*

■ The plaintiffs also contend that because the question of the directors' motives and good faith has been placed in issue, resolution by directed verdict is inappropriate. They rely on language in two cases, *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944) (issue as to amount of damages), and *Staren v. American National Bank and Trust Co.,* 529 F.2d 1257 (7th Cir. 1976) (issue as to whether individuals purchased securities for their own account or as agents), in which a trial court's grant of summary judgment was overturned. These cases are inapt for two reasons. First, the motion for summary judgment under Fed.R.Civ.P. 56 requires that there be "no genuine issue as to any material fact." Thus, to survive summary judgment a party need only *raise* an issue of fact, whereas the test on directed verdict is whether a party has presented sufficient evidence to support a finding in his favor on that contested issue. The directed verdict situation thus presents a higher evidentiary hurdle than the preliminary test of the summary judgment. Second, even under the *Sartor* standard, "[t]hat state of mind should generally be a jury issue does not mean it should always be so in all contexts, especially where the issue is recklessness, which is ordinarily inferred from objective facts." *Washington Post Co. v. Keogh,* 365 F.2d 965, 967–68 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967) (footnote omitted).

■ In this case the plaintiffs have placed in issue whether the defendants violated the antifraud prohibitions of the federal securities laws. The requisite mental state for such violations is at least recklessness, as the plaintiffs recognize in their brief, citing *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977). As the *Keogh* court correctly pointed out, that mental state must be inferred from objective facts. The question whether there are sufficient objective facts on which the jury can base a reasonable inference is the essence of any directed verdict determination by the trial court, *Hohmann v. Packard Instrument Corp.,* 471 F.2d at 819, and a directed verdict is thus no less appropriate in this case than in any other.

III. THE FEDERAL SECURITIES LAW CLAIMS

The plaintiffs allege violations of two broad antifraud provisions of the Securities Exchange Act of 1934. First, they claim the defendants violated § 14(e) of the Williams Act, 15 U.S.C. § 78n(e) (1976), which prohibits deception "in connection with any tender offer," and second, they claim the defendants breached SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1980), which similarly prohibits deceptive statements or conduct, "in connection with the purchase or sale of any security." The two provisions are coextensive in their antifraud prohibitions, and differ only in their "in connection with" language. They are therefore construed *in pari materia* by courts. *Golub v. PPD Corp.,* 576 F.2d 759, 764 (8th Cir. 1978); *Gulf & Western Industries, Inc. v. Great A & P Tea Co.,* 476 F.2d 687, 696 (2d Cir. 1973); *Altman v. Knight,* 431 F.Supp. 309 (S.D.N.Y.1977). Both provisions are manifestations of the "philosophy of full disclosure" embodied in the Securities Exchange Act of 1934. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51

L.Ed.2d 480 (1977). However, because the "in connection with any tender offer" language of the Williams Act provision presents special concerns not present in analysis under Rule 10b–5, we address these claims separately.[1]

A. *The Williams Act Claims.*

Section 14(e) of the Williams Act is a broad antifraud provision modeled after SEC Rule 10b–5, and is designed to insure that shareholders confronted with a tender offer have adequate and accurate information on which to base *the decision whether or not to tender their shares.*[2] *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58 (1975); *Lewis v. McGraw,* 619 F.2d 192 (2d Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980); *see* S.Rep.No.550, 90th Cong., 1st Sess. 3 (1967); H.R.Rep.No.1711, 90th Cong., 2d Sess. 3 (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2811, 2813.

Upon the announcement of a tender offer proposal a target company shareholder is presented with three options: he may retain his shares; he may tender them to the tender offeror if the offer becomes effective; or he may dispose of them in the securities market for his shares, which generally rises on the announcement of a tender offer. The plaintiffs have alleged that the defendants violated § 14(e) both by depriving them of their opportunity to tender their shares to CHH, the tender offeror, and by deceiving them as to the attractiveness of disposing of their shares in the rising market.

1. The Lost Tender Offer Opportunity.

By denying the plaintiffs the opportunity to tender their shares to CHH, the plaintiffs claim the defendants deprived them of the difference between $42.00, the amount of the CHH offer, and $19.76, the amount at which Field's shares traded in the market after withdrawal of the CHH proposal. Total damages under this theory would exceed $200,000,000.00.

Because § 14(e) is intended to protect shareholders from making a tender offer decision on inaccurate or inadequate information, among the elements of § 14(e) plaintiff must establish is "that there was a misrepresentation upon which the target corporation shareholders relied...." *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 373 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Because the CHH tender offer was withdrawn before the plaintiffs had the opportunity to decide whether or not to tender their shares, it was impossible for the plaintiffs to rely on any alleged deception in making the decision to tender or not. Because the plaintiffs were never presented with that critical decision and therefore never relied on the

---

1. The plaintiffs also allege a violation of § 14(d) of the Act, 15 U.S.C. § 78n(d) (1976), apparently on the theory that conduct which violates § 14(e) derivatively breaches § 14(d)(4), which provides:

(4) Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

The plaintiffs have not briefed any independent grounds upon which a § 14(d) violation could be premised. Therefore, and in light of our ruling on the plaintiffs' § 14(e) claims, we affirm the district court's ruling as to § 14(d) as well.

2. Section 14(e) provides:

(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

defendants' alleged misrepresentations, they fail to establish a vital element of a § 14(e) claim as regards the CHH $42.00 offer.

In the recent case of *Lewis v. McGraw*, 619 F.2d 192 (2d Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980), the Second Circuit similarly held that when a proposed tender offer fails to become effective, shareholders of the target company cannot state a cause of action for alleged misstatements under § 14(e) because of the absence of this crucial element of reliance. *Id.* at 195–96.

It is difficult indeed to imagine a case more directly to the point here than the *Lewis* decision. In that case the American Express Company proposed a "friendly business combination" with McGraw-Hill. McGraw-Hill's directors rejected the offer in a public letter as reckless, illegal, and improper. American Express then filed a proposed tender offer with the SEC, revealing its intention to make a second offer for the McGraw-Hill stock. The offer would not become effective unless McGraw-Hill agreed not to oppose it. McGraw-Hill's directors rejected the second offer, however, which therefore expired before becoming effective. McGraw-Hill shareholders sued for damages under § 14(e) of the Williams Act. In affirming the district court's dismissal for failure to state a cause of action, the court noted that "[i]n the instant case, the target's shareholders simply could not have relied upon McGraw-Hill's statements, whether true or false, since they were never given an opportunity to tender their shares." *Id.* at 195. The plaintiffs here seek to distinguish *Lewis* on its "unique facts." The two cases, however, are the same in all material aspects: both involve shareholders' allegations that incumbent management and directors prevented the plaintiffs from accepting a tender offer by issuing false and misleading statements or by breaching the fiduciary duties owed to the shareholders. In both cases the requisite element of reliance is absent.

The plaintiffs seek to establish that reliance is presumed from materiality in a case involving primarily a failure to disclose, relying on a line of cases culminating in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). As the court pointed out, however, in *Lewis*, neither *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), nor *Affiliated Ute* abolished the reliance requirement, but "[r]ather . . . held that in cases in which reliance is possible, and even likely, but is unduly burdensome to prove, the resulting doubt would be resolved in favor of the class the statute was designed to protect." *Lewis* at 195; *cf. Titan Group, Inc. v. Faggen*, 513 F.2d 234, 238–39 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975) (reliance element in 10b–5 suit not eliminated by *Ute.*)

The *Mills-Ute* presumption is essentially a rule of judicial economy and convenience, designed to avoid the impracticality of requiring that each plaintiff shareholder testify concerning the reliance element. *Auto-Lite*, 396 U.S. at 385, 90 S.Ct. at 622; *see Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 375 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973) ("These impracticalities are avoided by establishing a presumption of reliance where it is logical to presume that such reliance in fact existed . . . ."); *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 290 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972) (Adams, J., concurring in part, dissenting in part) (10b–5 action). However, when the logical basis on which the presumption rests is absent, it would be highly inappropriate to apply the *Mills-Ute* presumption. "[W]here no reliance [is] possible under any imaginable set of facts, such a presumption would be illogical in the extreme." *Lewis* at 195.

The plaintiffs here pose two additional arguments to application of the *Lewis* holding; first, that it allows a target company management to profit by their own wrong if they are successful in driving off a tender offeror with misrepresentations or omissions otherwise violative of the Act, and

second, that unless the pre-effective period is covered by the Act, violative statements could be made with impunity and later affect any future decision shareholders make after the offer becomes effective.

■ The claim that the defendants are allowed to profit by their own wrong is irrelevant to this case. Such an argument would require proof of a causal link between the defendants' wrongful acts or omissions and the withdrawal of the tender offer. Here there is uncontroverted evidence that it was Field's recent acquisitions and plans for expansion that caused the withdrawal of the CHH tender offer. The decision to make acquisitions is one governed by the state law of directors' fiduciary duty. *Altman v. Knight*, 431 F.Supp. 309 (S.D.N.Y.1977). Therefore even if such conduct were a breach of the defendant directors' fiduciary duty, the plaintiffs would be relegated to their remedy at state law. *See Section 10(b) and Rule 10b–5 Claims, infra.* This argument, therefore, cannot create a federal securities law claim when the alleged "wrong" the defendant committed is barred from federal scrutiny by the rule of *Santa Fe Industries*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *see Lewis* at 195.[3]

The plaintiffs' second argument, that statements made in the pre-effective period might have repercussions after the offer becomes effective, *see Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.*, 425 F.Supp. 1145, 1154 (S.D.N.Y.1977), is plainly inapt in the situation we address, where by hypothesis that future offer never materializes.

In sum, we find the reasoning of *Lewis* persuasive, if not compelling, and therefore affirm the district court's grant of the defendants' motion for directed verdict on the § 14(e) claims as to the lost tender offer opportunity.

### 2. The Plaintiffs' Decision Not to Sell in the Market.

The plaintiffs also contend that defendants' misrepresentations or omissions of material fact caused the plaintiffs not to dispose of their shares in the market, which was rising on the news of CHH's takeover attempt. Because we hold that a damages remedy for investors who determine not to sell in the marketplace when no tender offer ever takes place was not intended to be covered by § 14(e) of the statute, we are not swayed by the surface appeal of this argument.

The Supreme Court teaches that the starting point in ascertaining Congressional intent is always the language of the statute itself. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J.) (concurring opinion). Section 14(e) is applicable by its terms to conduct "*in connection with any tender offer* or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of *any such offer*, request or invitation." 15 U.S.C. § 78n(e) (1976) (emphasis added). The language is not unambiguous, but it does seem to contemplate the existence of an effective offer capable of acceptance by the shareholders. The legislative history of the Act is replete with indications that Congress intended to protect an investor faced with the pressures generated by the exigencies of the tender offer context, and that the sole purpose of § 14(e) is protection of the investor faced with the decision to tender or retain his shares: "In the rather common situation where existing management or third parties contest a tender offer, shareholders may be exposed to a bewildering variety of conflicting appeals and arguments designed to persuade them either to accept or to reject the tender offer." 113 Cong.Rec. 855–56 (1967) (remarks of Senator Williams). *See Hearings on S.510 Before the Subcomm. on Securities of the Sen-*

---

**3.** Our review here follows the order in which the issues were presented to this court, and deals with the federal claims first. Thus while we recognize here that the plaintiffs' allegations may state a claim for breach of fiduciary duty under state corporation law, there was a failure of proof to support these allegations, as will be demonstrated hereinafter. *See,* State Law Claims, *infra.*

ate Comm. on Banking and Currency, 90th Cong., 1st Sess. 33 (1967) (statement of Manuel F. Cohen, Chairman, SEC) ("[T]he bill is designed first, to provide those who receive a tender offer with information adequate to an informed decision whether or not to accept. . . ."); id. at 203, 205 (bill's purpose is "to assure that public shareholders will be given information adequate for an informed decision when a tender offer is made for the shares of their company"; disclosure needed so shareholder can "make an intelligent decision whether or not to tender his shares").

Courts seeking to construe the provisions of the Williams Act have also noted that its protections are required by the peculiar nature of a tender offer, which forces a shareholder to decide whether to dispose of his shares at some premium over the market, or retain them with knowledge that the offeror may alter the management of the target company to its detriment. See Piper v. Chris-Craft Industries, Inc., 430 U.S. at 35, 97 S.Ct. at 946; Bucher v. Shumway, 452 F.Supp. 1288, 1294 (S.D.N.Y.1978).

In another context, courts seeking to determine whether unconventional means of acquisition of controlling blocks of shares constitute a "tender offer" within the meaning of the Williams Act (which leaves the term undefined) have determined that the distinguishing characteristic of the activity the Williams Act seeks to regulate is the exertion of pressure on the shareholders to make a hasty, ill-considered decision to sell their shares. See, e. g., Wellman v. Dickinson, 475 F.Supp. 783 (S.D.N.Y.1979) (intensive private solicitation plus premium plus strict time constraints on acceptance created tender offer); S–G Securities, Inc. v. Fuqua Investment Co., 466 F.Supp. 1114 (D.Mass.1978) (widespread publicity campaign plus massive open market purchases created tender offer pressures). Here there was no deadline by which shareholders were forced to tender, and by hypothesis when we are discussing market transactions, no premium over the market. Therefore Field's shareholders were simply not subjected to the proscribed pressures the Williams Act was designed to alleviate. See

Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1207 (2d Cir. 1978) (solicitations to sell on national exchange where shareholders were offered no premium over the market and given no deadline by which to make their decision created "no pressure . . . on sellers other than the normal pressure of the marketplace," although the purchaser sought to obtain and exercise control of the company).

As we noted only last year in O'Brien v. Continental Illinois National Bank & Trust Co., 593 F.2d 54, 62–63 (7th Cir. 1979), the Supreme Court has continually limited the federal remedy in private federal securities actions. It has continued to decline the opportunity to enlarge that jurisdiction, most recently by denying certiorari in the cases of Lewis v. McGraw, supra, and Bucher v. Shumway, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,142 (S.D.N.Y.1979), aff'd, 622 F.2d 572 (2d Cir.), cert. denied, —— U.S. ——, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). In light of this trend to avoid unduly expansive interpretations of the securities laws, and our finding that § 14(e) was not intended to remedy the conduct complained of here, we hold that § 14(e) of the Williams Act does not give a damages remedy for alleged misrepresentations or omissions of material fact when the proposed tender offer never becomes effective.

The brief filed by the SEC as amicus curiae contends that failure to afford investors a damages remedy under § 14(e) in situations where a tender offer proposal is withdrawn before it becomes effective might lead to abuses. It poses the hypothetical situation "where a person announces a proposed tender offer that he never intends to make in order to dispose of securities of the subject company at artificially inflated prices. . . ." We note that such conduct would fall within the ambit of the prohibitions of Rule 10b–5, see infra. Cf. Zweig v. Hearst Corp., 594 F.2d 1261 (9th Cir. 1979) (financial columnist purchased stock knowing he would recommend it in his column and sell on the resulting rise;

failure to disclose this scheme violated 10b–5).

The SEC also suggests that without such a remedy, persons could announce tender offers, again without intending to make them, to put pressure on management to consider merger proposals. Although the present case does not present such a situation, we believe that preliminary injunctive relief would be the appropriate remedy for such conduct. In *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir. 1969) (Friendly, J.), the plaintiff, a target of a tender offer mounted by the defendant, sought preliminary injunctive relief under § 14(e), claiming that the defendant had misrepresented its intentions concerning a potential tender offer. The district court denied preliminary relief, but after a trial on the merits found for the plaintiffs. The Second Circuit reversed, finding no misrepresentation by the offeror. In reaching that result, however, it noted:

> We agree with plaintiffs to the extent of believing that the application for a preliminary injunction is the time when relief can best be given.... [W]e think that in administering § 14(d) and (e) ... if a violation has been sufficiently proved on an application for a temporary injunction, the opportunity for doing equity is ... considerably better then than it will be later on.

*Id.* at 947, *quoted with approval in Piper v. Chris-Craft Industries*, 430 U.S. 1, 42, 97 S.Ct. 926, 949, 66 L.Ed.2d 214 (1977) (defeated tender offeror does not have damages remedy under § 14(e)). The rule urged by the SEC would only serve to intensify the pressure such spurious offers would exert on incumbent management, by confronting them with the spectre of shareholder damage suits which could result from the withdrawal of even a sham tender offer.

B. *Section 10(b) and Rule 10b–5 Claims.*

The plaintiffs have also alleged and sought to prove that the defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1980), promulgated to implement that statute. Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The gravamen of the plaintiffs' 10b–5 claim is that Field's directors acted pursuant to a long-standing undisclosed policy of independence and resistance to all takeover attempts, designed to perpetuate the defendant directors' control of the corporation. The plaintiffs assert that the defendants' failure to disclose this policy was an omission of a material fact which made other statements and conduct of the defendants misleading. They also claim that the policy motivated the defendant directors to make other misrepresentations or omissions of material facts in relation to Field's prospects and plans.

As the Supreme Court noted in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977), the rule is a manifestation of the "philosophy of full disclosure," embodied in the Securities Exchange Act of 1934; it therefore requires proof of the element of deception, and does not provide a remedy for the breach of fiduciary duty a director owes his corporation and its shareholders under state law. *See In re Sunshine Mining Securities Litigation*, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,217 at 96,635 (S.D.N.Y.1979) (An interpretation of 10b–5 "which would include

instances of corporate mismanagement where shareholders were treated unfairly by a fiduciary, however, would be wholly inconsistent with the Congressional intent.").

In the wake of *Santa Fe,* courts have consistently held that since a shareholder cannot recover under 10b–5 for a breach of fiduciary duty, neither can he "bootstrap" such a claim into a federal securities action by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction. *See, e. g., Bucher v. Shumway,* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,142 at 96,300 (S.D.N.Y.1979), *aff'd,* 622 F.2d 572 (2d Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980) ("The securities laws, while their central insistence is upon disclosure, were never intended to attempt any such measures of psychoanalysis or preported [sic] self-analysis.").

1. The Policy of Independence.

The plaintiffs allege that the defendants, motivated by a desire to perpetuate their own control over Field's, adopted "a policy of resisting all offers to acquire Marshall Field & Company," regardless of the potential benefits such offers might bring to the shareholders of the company.

██ Even assuming that the plaintiffs were able to establish the existence of such a policy, neither the policy nor a failure to disclose its existence can give rise to a federal securities law cause of action absent the element of manipulation[4] or deception required by Rule 10b–5. *Santa Fe Industries, supra; Bucher, supra; In re Sunshine Mining, supra.*

██ The critical issue in determining whether conduct meets the requirement of deception, the Court announced in *Santa Fe Industries,* is whether the conduct complained of includes the omission or misrepresentation of a material fact, or whether it merely states a claim for a breach of a state law duty. A board of directors' decision to oppose or welcome a takeover attempt involves the exercise of directorial judgment inherent in their role in corporate governance. *Treadway Cos. v. Care Corp.,* 638 F.2d 357, 381 (2d Cir. 1980); *see Northwest Industries, Inc. v. B. F. Goodrich Co.,* 301 F.Supp. 706, 712 (N.D.Ill.1969) ("[M]anagement has the responsibility to oppose offers which, in its best judgment, are detrimental to the company or its stockholders.").

Thus in *Bucher v. Shumway,* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,142 (S.D.N.Y. 1979), *aff'd,* 622 F.2d 572, *cert. denied,* —— U.S. ——, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980), the plaintiff shareholders charged that the defendants, directors of their company, had rejected a favorable tender offer proposal without fairly considering it, and had instead sought to entrench themselves in control of the corporation by supporting a "friendly" tender offer at an unfair price. The court dismissed the shareholders' claims stating, "[T]he bare allegation does not state a cause of action under the securities laws. . . . It is essentially an allegation that [the directors] breached fiduciary duties owed to plaintiffs and then failed to disclose these alleged breaches." *Id.* at 96,-303.

Similarly in *Sunshine Mining, supra,* the plaintiffs claimed that incumbent management, motivated solely by the selfish interest to retain control and in complete disregard of their fiduciary obligation to the shareholders, withheld support from a lucrative tender offer opportunity. The court held that since the plaintiffs' claim that approval of the offer was withheld by management for purely selfish reasons amounted to no more than a claim that Sunshine management acted unfairly and in breach of its fiduciary duties, the plaintiffs failed to state a cause of action under the federal securities laws. *Id.* at 96,635–36.

4. The opinion of the district court has thoroughly disposed of any contention that the defendants' directors engaged in any manipulative conduct within the scope of the Act, and we adopt its reasoning to that extent.

The plaintiffs' allegations that Field's directors rebuffed all acquisition attempts without regard to merit and failed to disclose the existence of an alleged policy so to act, are similarly insufficient to create a federal cause of action. Like the claims above, they simply state a claim for a breach of the fiduciary duty directors owe shareholders under state corporate law. This is precisely the type of claim the Supreme Court intended to bar from the federal forum when it announced the rule in *Santa Fe Industries*. It is therefore "entirely appropriate in this instance to relegate [plaintiffs] ... to whatever remedy is created by state law," *Santa Fe*, 430 U.S. at 478, 97 S.Ct. at 1303, to the extent their claims are based on the existence of or failure to disclose any putative policy of independence.

### 2. Misrepresentations and Omissions of Material Fact.

The plaintiffs here, however, do not seek to recover solely on the basis of the existence of or failure to disclose a secret policy of independence. They also allege that pursuant to that policy the defendants issued a "stream" of deceptive or misleading statements, and engaged in conduct which acted as a deception. These allegations cluster around four factual occurrences: (a) CHH's $36.00 offer of December 12, 1977; (b) Field's filing of the antitrust suit against CHH on December 12, 1977; (c) the acquisitions Field's made and announced between December 12, 1977 and February 22, 1978; and (d) the use of earnings figures for the nine months ending in September, 1977 in communications to Field's shareholders.

In analyzing these claims, we keep in mind the post-*Santa Fe* rule that if

the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law. To hold otherwise would be to eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship.

*Hundahl v. United Benefit Life Insurance Co.*, 465 F.Supp. 1349, 1365–66 (N.D.Tex. 1979); *Altman v. Knight*, 431 F.Supp. 309 (S.D.N.Y.1977) (claim that directors made a wasteful defensive acquisition and falsely stated a legitimate business purpose, barred by *Santa Fe*). But cf. *Royal Industries, Inc. v. Monogram Industries, Inc.*, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,863 (C.D.Cal.1976) (defensive acquisition breached 10b–5; pre-*Santa Fe* case).

Furthermore, in order to prevail, the alleged misrepresentation or omission must be of a material fact. A material fact is one substantially likely to "have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

### (a) CHH's $36.00 Offer of December 12, 1977.

The plaintiffs allege one omission of material fact and two misrepresentations in relation to Field's response to the CHH letter of December 12, proposing a merger of the two companies at $36.00 per share. The plaintiffs assert that the defendants' press release of December 12, 1977, omitted a material fact when it failed to disclose that the $36.00 offer was merely the basis for negotiations. That the offer, however, was only a basis for negotiations was clearly indicated in CHH's press release announcing the $36.00 proposal. "[The] plaintiffs cannot complain merely because [Field's] did not re-emphasize facts that might have been helpful to [CHH] in its tender offer 'although such facts would have been known to the ordinary investor ... through papers of general circulation.'" *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1327 (W.D.Mich.1978), *quoting Gulf & Western Industries, Inc. v. Great A & P Tea Co.*, 356 F.Supp. 1066, 1071 (S.D.N.Y.), *aff'd* 476 F.2d 687 (2d Cir. 1973). We therefore hold that this omission fails to meet the standard of materiality set forth in *TSC Industries, supra*.

■ The plaintiffs also contend that although the Field's press release of December 14, 1977, called the $36.00 proposal inadequate, no one had ever analyzed the offer as inadequate, and that the defendants therefore misrepresented the attractiveness of the $36.00 offer. In light of the evidence that Field's investment bankers clearly indicated at the board meeting their belief (subsequently vindicated by the $42.00 offer) that a higher price could be obtained, and the board's knowledge of Carter's statement that a $60.00 offer might be forthcoming from a foreign company at any time, it was reasonable for the board to find that the $36.00 price was inadequate. We therefore hold that no reasonable juror could find Field's statements as to the adequacy of the $36.00 offer deceptive.

■ Finally the plaintiffs contend that in the December 20, 1977, press release, Field's misrepresented the nature of the consideration it had given the CHH proposal of December 12, when it stated that the board had rejected the offer only after "careful consideration." The plaintiffs first point to the board minutes of October 13, 1977, which reflect the board's decision that any merger with CHH "should not be considered." It is disingenuous of the plaintiffs to point to this statement, which reflects the board's reaction to preliminary informal contacts (one of which was made to the ninety-three year old father of one of the board members) made only days after the unexpected death of Burnham, Field's Chairman and Chief Executive Officer. Particularly in light of the uncontroverted evidence that on December 13, prior to the issuance of this press release, the Field's board met for several hours solely to consider the CHH approach, and to receive the analysis and advice of counsel, management, and investment bankers to aid that consideration, no reasonable juror could find that Field's management did not sufficiently carefully consider the CHH December 12, 1977 proposal. *See Northwest Industries, Inc. v. B. F. Goodrich Co.*, 301 F.Supp. 706, 709 (N.D.Ill.1969) (board consideration of multimillion dollar defensive acquisition during first hour of luncheon

meeting sufficient to render its decision conclusive). Furthermore, even if the defendants did reject the proposal without the careful consideration the evidence unquestionably establishes they did, this decision would be insulated from federal securities law scrutiny by the rule of *Santa Fe Industries.*

(b) Field's Filing of the Antitrust Suit.

■ The plaintiffs contend that the defendants made four omissions of material fact in public statements about the antitrust suit it filed against CHH on December 12, 1977. First, the plaintiffs cite three omissions in the Field's press release of December 12, 1977, which announced the filing of the suit; failure to disclose that Field's antitrust counsel was not present at the meeting when the defendants decided to file the suit; failure to mention CHH's offer to attempt to cure perceived antitrust violations; and failure to mention Field's motive in filing the suit, which the plaintiffs allege was to further the secret policy of independence. Second, the plaintiffs contend that Field's press release of December 22, 1978, again omitted to disclose CHH's willingness to cure any perceived antitrust problems. In light of our finding that the decision to bring the antitrust action falls, again, within the scope of directors' acts insulated from our scrutiny by the doctrine of *Santa Fe Industries v. Green, supra,* we pass over the materiality of these omissions, which is called into question by the opinion of Field's experienced antitrust counsel that such curative attempts would be futile. As appellants concede in their brief to this court, "the 'antitrust issue' is relevant to plaintiffs' case . . . only to the extent that . . . the initiation of antitrust litigation [was] an additional circumstance from which defendants' improper intent could be inferred." As we discussed above in the matter of the alleged policy of independence, the decision to resist a takeover is within the scope of directors' state law fiduciary duties, and there is no federal securities law duty to disclose one's motives in undertaking such resistance. *In*

*re Sunshine Mining, supra,* at 96,635–36; *Berman v. Gerber Products Co.,* 454 F.Supp. at 1318, 1323; *Altman v. Knight,* 431 F.Supp. at 314. *See Chemetron Corp. v. Crane Co.,* 1977–2 Trade Cas. ¶ 61,717 (N.D. Ill.1977). Therefore even assuming the antitrust suit was filed with the "impure" intent to preserve the directors' position at the expense of the shareholders' best interests, no federal securities claim can lie for failure to disclose that intent.

(c) The "Defensive" Acquisitions.

██ The plaintiffs also allege that Field's issued a series of misrepresentative or misleading statements in regard to the acquisitions Field's undertook in the months following the CHH approach. Of course, after *Santa Fe,* the decision to make acquisitions is shielded from federal scrutiny, as is inquiry into what motivated the acquisitions.

██ Specifically, the plaintiffs claim that in press releases of January 5, and February 8, 1978, the defendants announced that the acquisitions were taking place in accordance with their "longstanding programs" and expansion plans. The plaintiffs claim that the failure to disclose that such plans were historically undertaken only in response to perceived takeover threats made Field's announcements misleading. Once again, the plaintiffs have done no more than attempt to dress up a claim for breach of fiduciary duty by alleging a failure to disclose a motive to act contrary to shareholders' interests. Furthermore, there is no evidence upon which a reasonable jury could base a finding that Field's misrepresented its acquisition plans. There was substantial uncontroverted evidence, including testimony of the plaintiff's own expert witness, that Field's had prior intent to expand into the Pacific Northwest and Texas areas, and that such expansion was "natural" and "logical."

██ The plaintiffs also complain of the failure to disclose in the January 20, 1978,

press release announcing the acquisition of the Liberty House stores that the defendants considered two of the five Liberty House stores to be "dogs." This claim is no more than an attempt to probe the business judgment of the directors, and cannot create a federal claim. *Cf. Goldberger v. Baker,* 442 F.Supp. 659, 664 (S.D.N.Y.1977) ("Even under the most narrow reading of *Green,* an allegation of deception must allege more than a mere failure to disclose the 'unfairness' of a transaction.").

██ The plaintiffs also claim that the defendants' press release announcing Field's plans to enter the Galleria in Houston, Texas, and to expand through the south, starting in Dallas, omitted material facts when it failed to disclose the presence of CHH Neiman-Marcus stores in the Galleria and in Dallas. Under the standard of materiality set out in *TSC Industries, supra,* and as interpreted in *Berman* and *Gulf & Western v. A. & P., supra,* it is difficult to perceive how the omission of this information, which was readily available to anyone looking at CHH's annual report, or indeed to anyone at all familiar with the department store business, could be deceptive. In addition, the plaintiffs could never establish the requisite element of causation, for it was not the failure to disclose Neiman-Marcus' presence which caused the withdrawal of the offer, but rather Field's actual entry into the Galleria which caused the withdrawal of the offer. *Altman v. Knight,* 431 F.Supp. at 314.

(d) The Misleading Projections.

The plaintiffs also claim they were deceived by the "rosy" projections for future growth expressed by Field's management. Specifically they allege misrepresentations in press releases of December 14 and 15, 1977, which recounted how "confident about the future of the company" management was, and that momentum within the company was excellent. The plaintiffs allege that these misrepresentations culminated in a public letter dated December 20, 1977.[5]

5. The relevant portions of that letter stated:

A number of programs to improve our profitability and expand our profit base were

The plaintiffs claim that this letter, which cited a thirteen percent increase in consolidated net income before ventures and taxes, was fatally misleading in that it failed to disclose that the defendants' "five-year plan," a projective document generated for internal management use only, showed at that time an anticipated decline of seven percent in consolidated net income for the year.

While it is true that there is no duty upon management or directors to disclose financial projections, *see, e. g., Freeman v. Decio*, 584 F.2d 186, 199–200 (7th Cir. 1978), it is also axiomatic that once a company undertakes partial disclosure of such information there is a duty to make the full disclosure of known facts necessary to avoid making such statements misleading. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977) (release of nine months earnings figures showing $1.16 earnings per share were made misleading by the failure to release existing accounting reports which defendants knew would require year-end write-offs resulting in a $0.15 loss per share); *see Marx v. Computer Sciences Corp.*, 507 F.2d 485, 489–92 (9th Cir. 1974).

However, projections, estimates, and other information must be reasonably certain before management may release them to the public. Thus in the recent case of *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir. 1980), the Ninth Circuit rejected a claim that defendants had a duty to disclose internal projections during the course of a tender offer for its own shares. The court held "[i]t is just good general business practice to make such projections for internal corporate use. There is no evidence, however, that the estimates were made with such reasonable certainty even to *allow* them to be disclosed to the public." *Id.; see Berman v. Gerber Products, Inc.*, 454 F.Supp. at 1328; *cf. First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1318 (5th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1979) (a lender's duty to disclose known irregularities in his debtor's accounts "resemble a recital of raw fact more than they resemble a prediction of future stock prices").

The earnings projections the plaintiffs allege should have been disclosed were contained in a five-year plan which had been hastily updated only the very day of the board meeting to consider the CHH first proposal. It was one of a series of five-year plans which were continually updated and used internally by Field's management to explore planning and development. That the projections it contained were highly tentative seems the compelling inference from the evidence that Field's projections varied from those of its own investment bankers, were considered merely "valid to use for the present purpose," of evaluating the Carter Hawley offer, and that they ended up varying substantially from Field's performance as revealed by the actual year-end earnings which finally came in a full twenty-five percent down from the

---

initiated before I came here, and others have been started since I arrived. These include:
—Modernization and expansion of many of our stores
—Revitalization of our merchandising programs
—Analysis of further opportunities in new store locations and new market areas
—Disposition of unprofitable interests in real estate and hotel ventures
Even at this early date, these programs are having positive effect. For example, we have disposed of most of our interest in The Ritz-Carlton hotel. This has eliminated a significant drain on our earnings. The revitalized merchandising programs are generating increased sales.

—For the nine months ended October 31, income before ventures and taxes was up 24.4% and consolidated net income was up 13%.
—Sales showed a gain of 9.4%, virtually all from comparable stores open both years.
We limit our discussion to whether omission of the projections made the letter misleading because we find that no rational juror could find it deceptive on its face. The sentences immediately preceding those cited by the plaintiffs make it absolutely clear that Field's earnings would be adversely affected in that fiscal year by the unprofitable ventures. The thrust of the letter is that there is light at the end of the earnings tunnel, not that this will be a banner year for Field's earnings.

prior year. We therefore find that because the projections of the five-year plan were tentative estimates prepared for the enlightenment of management with no expectation that they be made public, there was no duty to reveal them. Indeed, in light of the degree by which they failed to project the extent of the decline in earnings, release of the seven percent estimate might have subjected the defendants to securities law liability. *Cf. SEC v. Texas Gulf Sulphur*, 312 F.Supp. 77, 83–84 (S.D.N.Y.1970), *aff'd in part, rev'd in part,* 446 F.2d 1301 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971) (optimistic press release misleading because not optimistic enough).

We therefore affirm the ruling of the district court that the plaintiffs failed to present sufficient evidence to support a reasonable jury finding of the element of deception required by Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934.

## IV. THE STATE LAW CLAIMS

The plaintiffs here have also sought to establish that the defendants committed two violations of state law. First, they contend, the defendants breached their fiduciary duty as directors to the corporation and its shareholders by adopting a secret policy to resist acquisition regardless of benefit to the shareholders or the corporation; by failing to disclose the existence of such a policy; by making defensive acquisitions; and by filing an antitrust suit against CHH. Second, they argue that the

defendants interfered with the plaintiffs' prospective economic advantage when that allegedly wrongful behavior caused CHH to withdraw its proposed tender offer before it became effective.

### A. *The Business Judgment Rule.*

▮▮▮▮ Under applicable Delaware corporate law, claims such as those made by the plaintiffs are analyzed under the "business judgment" rule. The trial court described this rule as establishing that

[d]irectors of corporations discharge their fiduciary duties when in good faith they exercise business judgment in making decisions regarding the corporation. When they act in good faith, they enjoy a presumption of sound business judgment, reposed in them as directors, which courts will not disturb if any rational business purpose can be attributed to their decisions. In the absence of fraud, bad faith, gross overreaching or abuse of discretion, courts will not interfere with the exercise of business judgment by corporate directors.

486 F.Supp. at 1194 (citations omitted). We find this an apt summary of appropriate Delaware law.[6] *See GM Sub Corp. v. Liggett Group, Inc.,* No. 6155, slip op. at 3 (Del.Ch. Apr. 25, 1980) (citing the district court opinion with approval). In the recent case of *Johnson v. Trueblood,* 629 F.2d 287 (3d Cir. 1980), the U.S. Court of Appeals for the Third Circuit had occasion to analyze the purpose of the Delaware business judgment rule in the context of a takeover attempt. The plaintiffs contended that an

---

**6.** The trial court also excluded the plaintiffs' proffered expert testimony on the ordinary standards against which the actions of boards of directors and investment bankers would be measured. The trial court ruled that such evidence would impinge on the function of the trial court, and furthermore, as to the investment bankers, was irrelevant to the issue of the directors' liability.

The standard of review in considering the admission of expert testimony is whether the trial court judge's exclusionary ruling was clearly erroneous. *Karp v. Cooley,* 493 F.2d 408, 424 (5th Cir. 1974). Viewing the testimony in this light, we affirm the district court's ruling. In *Marx & Co. v. Diners' Club, Inc.,* 550

F.2d 505, 509–10 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), the court cautioned against the danger of letting experts in a securities case usurp the function of the judge, stating, "It is not for witnesses to instruct the jury as to applicable principles of law, but the judge." The expert would have been able to add nothing to the formulation of the proper standards for evaluating the conduct of Field's directors enunciated by the trial court. We also agree with the trial court that testimony on how the investment bankers should have responded to the CHH proposal is irrelevant to this case, in which it is the conduct of the directors that is the issue.

allegation of a purpose to retain control was enough to shift the burden to incumbent directors to show the rational business purpose of the disputed transaction. In rejecting that contention Chief Judge Seitz, formerly a Delaware Chancellor, stated:

First, the purpose of the business judgment rule belies the plaintiffs' contention. It is frequently said that directors are fiduciaries. Although this statement is true in some senses, it is also obvious that if directors were held to the same standard as ordinary fiduciaries the corporation could not conduct business. For example, an ordinary fiduciary may not have the slightest conflict of interest in any transaction he undertakes on behalf of the trust. Yet by the very nature of corporate life a director has a certain amount of self-interest in everything he does. The very fact that the director wants to enhance corporate profits is in part attributable to his desire to keep shareholders satisfied so that they will not oust him.

The business judgment rule seeks to alleviate this problem by validating certain situations that otherwise would involve a conflict of interest for the ordinary fiduciary. The rule achieves this purpose by postulating that if actions are arguably taken for the benefit of the corporation, then the directors are presumed to have been exercising their sound business judgment rather than responding to any personal motivations.

Faced with the presumption raised by the rule, the question is what sort of showing the plaintiff must make to survive a motion for directed verdict. Because the rule presumes that business judgment was exercised, *the plaintiff must make a showing from which a factfinder might infer that impermissible motives predominated in the making of the decision in question.*

The plaintiffs' theory that "a" motive to control is sufficient to rebut the rule is inconsistent with this purpose. Because the rule is designed to validate certain transactions despite conflicts of interest, the plaintiffs' rule would negate that purpose, at least in many cases. As already noted, control is always arguably "a" motive in any action taken by a director. Hence plaintiffs could always make this showing and thereby undercut the purpose of the rule.

*Id.* at 292–93 (emphasis added).

*GM Sub Corp., supra,* involved a shareholder's claim that the defendants, directors of a target company, divested the company of its most important asset in an attempt to make it less attractive to an ardent but unwelcome suitor. In analyzing this action under the Delaware business judgment rule, the court formulated the following test of the improper motive necessary to overcome the presumption of good faith:

[N]ot every action taken by a board of directors to thwart a tender offer is to be condemned. The test, loosely stated, is whether the board is fairly and reasonably exercising its business judgment to protect the corporation and its shareholders against injury likely to befall the corporation should the tender offer prove successful.

Slip op. at 3.

■ We also note that a majority of the directors of Field's were "independent": they derived no income from Field's other than normal directors' fees and the equivalent of an employee discount on merchandise. The presumption of good faith the business judgment rule affords is heightened when the majority of the board consists of independent outside directors. *See, e. g., Warshaw v. Calhoun,* 221 A.2d 487, 493 (Del.1966); *Puma v. Marriott,* 283 A.2d 693, 695 (Del.Ch.1971).

■ The plaintiffs suggest that director Blair's independence was called into question by the fact that his investment banking firm did work for Field's. In *Maldonado v. Flynn,* 485 F.Supp. 274 (S.D.N.Y.1980), the court dismissed such an implication as "a non sequitur and hardly worthy of comment." *Id.* at 283. We agree. Even less relevant was the plaintiffs' attempt to show that director Smith's independence was weakened because he owned a substantial

share of a bank in which Field's deposited monies and had other accounts. That inference is so attenuated that the trial court properly excluded the evidence as irrelevant.

■ However, rather than proceeding under the business judgment rule, the plaintiffs here seek to apply a different test in the takeover context, and propose that the burden be placed upon the directors to establish the compelling business purpose of any transaction which would have the effect of consolidating or retaining the directors' control. In light of the overwhelming weight of authority to the contrary, we refuse to apply such a novel rule to this case. *Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 701–03 (2d Cir. 1980); *Treadway Cos. v. Care Corp.*, 638 F.2d 357, 381 (2d Cir. 1980); *Johnson v. Trueblood, supra; Gimbel v. Signal Cos.*, 316 A.2d 599, 601, 609 (Del.1974); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971); *Warshaw v. Calhoun*, 221 A.2d 487 (Del.1966); *GM Sub Corp., supra; Kaplan v. Goldsamt*, 380 A.2d 556, 568 (Del.Ch.1977). To the extent that dicta in *Klaus v. Hi-Shear Corp.*, 528 F.2d 225 (9th Cir. 1975), suggest a different result under the corporation law of California, we decline to follow that rule.

Copperweld Corp. v. Imetal, 403 F.Supp. 579, 608 (W.D.Pa.1975), also relied on by the plaintiffs, is inapposite to this case. It involved no charge of a breach of fiduciary duty, but was rather a target company's suit for a preliminary injunction against the acquisition of its shares by a foreign tender offeror. The court there referred to shareholders only while considering as a relevant factor to issuance of the injunction the possibility of harm to interested persons not parties to the suit. The "absence of a compelling reason" referred not to any *business* purpose, but rather to the failure of the plaintiffs to demonstrate a likelihood of success on the merits or the danger of irreparable harm. The case provides no support for the plaintiffs' novel theory of directors' liability. Analyzing the plaintiffs' evidence under the well-established test, we find the thorough and fair-minded evaluation of the district court amply disposes of the issues.[7]

B. *The Breach of Fiduciary Duty.*

1. The Policy of Independence.

The plaintiffs contend that they have presented sufficient evidence to go to the jury on the existence of the secret policy, both circumstantially, from the history of prior rebuffs, and directly, from the testimony of two Field's directors.

7. We are not persuaded by the dissent's attempts to distinguish the line of cases culminating in *Crouse-Hinds*. We believe the *Crouse-Hinds* court, in reversing an interpretation of *Treadway* similar to that espoused by the dissent, foreclosed that construction of the business judgment rule. It found that allegations of intent to retain control were insufficient as a matter of law even to raise a sufficiently serious question to make a fair ground for litigation. As the *Trueblood* court concluded, "at a minimum, the Delaware cases require that the plaintiff must show some sort of bad faith on the part of the defendant.... We do not think that a showing of 'a' motive to retain control, without more, constitutes bad faith in this context unless we are to ignore the realities of corporate life." 629 F.2d at 293. Because our examination of the board's conduct does not reveal such bad faith, we do not believe an evaluation of the fairness or wisdom of the board's conduct is called for as long as it can be attributed to any rational business purpose.

Nor are we persuaded by the dissent's reliance on *Klaus v. Hi-Shear*, 528 F.2d 225 (9th Cir. 1975), and *Royal Indus., Inc. v. Monogram Indus., Inc.* [1976–77 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 95,863 (C.D.Cal.1976), both of which apply California corporate law. We note as a general matter that California law seems to impose a higher standard of fiduciary care than does the law of Delaware, which is applicable here. *Compare, e.g., Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del.1971) (absent proof of self-dealing, fraud, or "gross and palpable over-reaching," courts will not examine the intrinsic fairness of the majority's control of the corporation even if it is to the detriment of the minority) *with Jones v. H. F. Ahmanson & Co.*, 1 Cal.3d 93, 81 Cal.Rptr. 592, 600, 460 P.2d 464 (1969) (majority has a fiduciary duty to minority, and transactions involving control will be examined under "a comprehensive rule of 'inherent fairness from the viewpoint of the corporation and those interested therein.'"). *See* 59 Cal.L.Rev. 167, 180 (1971); 7 Pac.L.Rev. 613, 617–19 (1976).

On the resistance to prior approaches, we have established above that evaluation and response to such approaches is within the scope of the directors' duties. The plaintiffs have presented no evidence of self-dealing, fraud, overreaching or other bad conduct sufficient to give rise to any reasonable inference that impermissible motives predominated in the board's consideration of the approaches. The desire to build value within the company, and the belief that such value might be diminished by a given offer is a rational business purpose. The record reveals that appropriate consideration was given to each individual approach made to Marshall Field & Company.[8] The plaintiffs have failed to introduce evidence supporting a reasonable inference that any of the rejections of these approaches were made in bad faith. Therefore the presumption of good faith afforded by the business judgment rule applies, and the plaintiffs cannot survive the motion for directed verdict.

Having failed to establish the presence of an improper motive in any one of the defendants' responses to acquisition approaches, the plaintiffs seek to establish from the series of rejections the illogical inference that this reflects an invidious policy of independence regardless of benefit to the shareholders. All that the plaintiffs' evidence in this regard establishes is that Field's directors evaluated the merits of each approach made, and determined to implement their decisions as to each of the approaches by following the advice of counsel on how to respond to unwanted acquisition approaches.

The mere fact that two of the ten directors felt that the word "independence" reflected the board policy of trying to build value within the company rather than putting it up for sale, does not reveal an impermissible motive to reject all acquisition attempts regardless of merit. Furthermore, there is testimony by both directors who used the word "independent" that neither meant by it resistance at all costs, or against the best interests of the shareholders. We therefore affirm the district court's holding that the plaintiffs failed to raise a jury question on the issue of the alleged policy of independence.

The plaintiffs also contend that failure to reveal the prior rebuffs or the policy of independence amounted to a breach of fiduciary duty. None of the prior attempts ever rose to the level of a definite offer or merger proposal. Directors are under no duty to reveal every approach made by a would-be acquiror or merger partner. *See Missouri Portland Cement Co. v. H. K. Porter Co.*, 535 F.2d 388, 398 (8th Cir. 1976); *Berman v. Gerber Products*, 454 F.Supp. 1310, 1318 (W.D.Mich.1978); *Elgin*

---

8. The trial court judge limited admission of evidence on these pre-CCH takeover approaches to "documents that show statements made at the Board of Directors' meetings, [and] letters written by the defendants as to those." It excluded other evidence as to the transactions, stating, "to go through these individual transactions would require an inquiry into who made it, the circumstances of it being made, what were the economic circumstances at the time, what was the financial stability of those who made it, and what were the motives and purposes of those who made it. That will extend this record unnecessarily. . . . [T]o go into these individual transactions would go afield into all matters which would be totally collateral." Questions of admissibility of evidence of prior acts are peculiarly within the province of the trial court. *See, e. g., United States v. Czarnecki*, 552 F.2d 698, 702 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977). Particularly when admission of the challenged evidence is likely to be cumulative and confusing, we will not overturn the sound exercise of the trial court's discretion. Furthermore, the plaintiff was not prejudiced by this ruling because the trial court judge saw all the evidence in offers of proof before ruling that there was no issue of fact on which the jury could rule.

The court also excluded hypothetical questions based on the existence of a policy of resistance. Again, this determination was within the broad discretion of the trial court. When a hypothetical question is not supported by independent evidence it is subject to objection. *Grand Island Grain Co. v. Roush Mobile Home Sales, Inc.*, 391 F.2d 35, 40–41 (8th Cir. 1968). Such a question is particularly harmful where it assumes that very wrongful conduct which is the central issue of the plaintiffs' case, and the trial court acted properly in excluding it.

*National Industries, Inc. v. Chemetron Corp.*, 299 F.Supp. 367, 371 (D.Del.1969). Thus, there was no breach of fiduciary duty in the failure to disclose prior takeover attempts. Neither can there be liability for a failure to disclose the policy of resistance. Because we have found that it is not reasonable to infer that such a policy existed, there can be no liability for failure to disclose it. *Vaughn v. Teledyne*, 628 F.2d 1214, 1221 (9th Cir. 1980).

### 2. The Defensive Acquisitions.

 The plaintiffs also contend that the "defensive" acquisitions of the five Liberty House stores and the Galleria were imprudent, and designed to make Field's less attractive as an acquisition, as well as to exacerbate any antitrust problems created by the CHH merger. It is precisely this sort of Monday-morning-quarterbacking that the business judgment rule was intended to prevent. Again, the plaintiffs have brought forth no evidence of bad faith, overreaching, self-dealing or any other fraud necessary to shift the burden of justifying the transactions to the defendants. On the contrary, there was uncontroverted evidence that such expansion was reasonable and natural. Thus even if the desire to fend off CHH was among the motives of the board in entering the transactions, because the plaintiffs have failed to establish that such a motive was the sole or primary purpose, as has been required by Delaware law since the leading case of *Cheff v. Mathes*, 41 Del.Ch. 494, 199 A.2d 548 (1964), the mere allegation, or even some proof, that a given transaction was made on "unfavorable" terms does not meet the fairly stringent burden the business judgment rules imposes on plaintiffs.[9]

### 3. The Antitrust Suit.

 The plaintiffs also contend that the bringing of the antitrust suit against CHH was a breach of the directors' fiduciary duty. Because it is the duty of the directors to file an antitrust suit when in their business judgment a proposed combination would be illegal or otherwise detrimental to the corporation, *see Chemetron Corp. v. Crane Co.*, 1977-2 Trade Cas. ¶ 61,717 at 72,933 (N.D.Ill.1977); *Gulf & Western Industries, Inc. v. Great A & P Tea Co.*, 476 F.2d 687, 698 (2d Cir. 1973), their decision to file an antitrust suit is also within the scope of the business judgment rule. There was substantial evidence before the court that the defendants were fairly and reasonably exercising their business judgment to protect the corporation against the perceived damage an illegal merger could cause, *see Copperweld Corp. v. Imetal*, 403 F.Supp. 579, 607 (W.D.Pa. 1975) ("no doubt that [divestiture] would have a debilitating effect on the acquired company . . . .").

 Not only were the directors acting in good faith reliance on the advice of experienced and knowledgeable antitrust counsel, which in itself satisfies the requirements of the business judgment rule, *Spirt v. Bechtel*, 232 F.2d 241, 247 (2d Cir. 1956); *Voege v. Magnavox Co.*, 439 F.Supp. 935, 942 (D.Del.1977), but one member of the board was an experienced antitrust lawyer with a background of experience to evaluate the soundness of the legal claims. *See Abramson v. Nytronics, Inc.*, 312 F.Supp. 519, 531–32 (S.D.N.Y.1970) ("Boards of directors are deliberately chosen from the ranks of businessmen, bankers, and lawyers because of their expertise in evaluating the merits of precisely this sort of proposal."). The plaintiffs have introduced no evidence that the suit was brought in bad faith, but merely cite it as an example of the defendants' desire to perpetuate their control. However, because the bringing of the suit clearly served the rational business purpose of protecting Field's from the damage forced divestiture would cause, it is protected by the business judgment rule. Field's decision to resolve the antitrust question

---

**9.** It was therefore appropriate for the trial court to exclude as irrelevant evidence offered to show financial details of Field's negotiations with Homart Corporation regarding possible entry into Northbrook Court, and details of Field's lease negotiations with the owners of the Galleria in Houston.

through litigation in federal court rather than some other method or in some other forum is a matter for the discretion of the directors when it is exercised within the scope of the rule.

Because we find insufficient evidence on which a jury could base a rational verdict that the defendants breached any fiduciary duty, neither can any claim of concealment of bad faith activity give rise to a jury question. We therefore affirm the district court's ruling on the state law claims of breach of fiduciary duty.

### C. Interference with Prospective Advantage.

■■■ It is hornbook law that the actions complained of in a claim for intentional interference with prospective advantage must be wrongful. W. Prosser, Torts, § 130 at 951 (4th ed. 1971). *See Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 360 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *A&K Railroad Materials, Inc. v. Green Bay & Western Railroad*, 437 F.Supp. 636, 645–46 (E.D.Wis.1977); *see Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 16 Ill.App.3d 709, 714, 306 N.E.2d 549, 553 (1973), *rev'd on other grounds*, 61 Ill.2d 129, 334 N.E.2d 160 (1975) (plaintiff claimed that malicious falsehoods in credit report prevented it from entering further dealings with potential creditors; "[d]efamatory statements may in themselves give rise to a cause of action for libel or slander and, at the same time, become the means by which the [tort] of interference with ... prospective economic advantage [is] committed.").[10]

■■ In *City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill.App.3d 359, 362–63, 300 N.E.2d 331, 333 (1973), the Appellate Court of Illinois aptly summarized the rationale for this requirement:

The theory of the tort of interference, it is said, is that the law draws a line beyond which no member of the community may go in intentionally intermeddling with the business affairs of others; that if acts of which complaint is made do not rest on some legitimate interest, or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed; and that line of demarcation between permissible behavior and interference reflects the ethical standards of the community.

*Id.* Because we have held that the trial court correctly found that the plaintiffs did not present sufficient evidence of such improper behavior on the part of the defendants, we must affirm as to this ground as well.

Furthermore, Illinois courts have consistently held that the plaintiff must allege and prove facts which demonstrate that the defendants acted with the purpose of injuring the plaintiff's expectancies. *Herman v. Prudence Mutual Casualty Co.*, 41 Ill.2d 468, 473, 244 N.E.2d 809, 812 (1969); *Crinkley v. Dow Jones & Co.*, 67 Ill.App.3d 869, 880, 24 Ill.Dec. 573, 584, 385 N.E.2d 714, 722 (1978); *Parkway Bank & Trust Co. v. City of Darien*, 43 Ill.App.3d 400, 403–04, 2 Ill.Dec. 234, 237–38, 357 N.E.2d 211, 215 (1976). As is demonstrated above, the plaintiffs have failed to provide sufficient evidence that the directors were acting out of other than good-faith motives with the well-being of the corporation foremost in their minds. The plaintiffs have thus also failed to establish this requisite element of improper intent.

■■ To adopt the rule the plaintiffs seek to impose here would substantially obtenebrate the reasonableness of consideration by boards of directors of a tender offer,

---

10. Delaware courts hold that the law of the place of the tort governs in actions for interference with a prospective economic advantage. *Bowl-Mor Co. v. Brunswick Corp.*, 297 A.2d 61, 64 n.2 (Del.Ch.1972). We therefore look to Illinois law in determining whether the plaintiffs have fulfilled the elements of a cause of action. We note that the substantive law of Delaware and Illinois are at any rate the same in actions for interference with a prospective economic advantage. *See DeBonaventura v. Nationwide Mutual Ins. Co.*, 419 A.2d 942, 947 (Del.Ch.1980); *Bowl-Mor Co. v. Brunswick Corp., supra.*

and is in direct conflict with the duty of directors to evaluate proposed business combinations on their merits and oppose those detrimental to the well-being of the corporation even if that is at the expense of the short term interests of individual shareholders. *See Gulf & Western Industries,* 476 F.2d at 698; *Elco v. Microdot, Inc.,* 360 F.Supp. 741, 754–55 (D.Del.1973) (if an acquisition would violate the antitrust laws, the interests of shareholders in tendering their shares "must yield," although "barring consummation of this tender offer will deprive these stockholders of their premium," since "this is a premium to which they cannot justly lay claim"); *cf. Kors v. Carey,* 39 Del.Ch. 47, 158 A.2d 136, 140 (1960) (concern with antitrust violations evidences directors' proper discharge of fiduciary duty). In the absence of sufficient evidence that the directors acted improperly to overcome the presumption of the business judgment rule, a case cannot proceed to the jury on an interference with prospective economic opportunity theory.

## V. CONCLUSION

We therefore conclude, as did the district court, that the plaintiffs have failed to provide a sufficient evidentiary basis on which reasonable jurors could find violations of either the federal securities laws, or state law. The judgment of the district court is affirmed.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

Unfortunately, the majority here has moved one giant step closer to shredding whatever constraints still remain upon the ability of corporate directors to place self-interest before shareholder interest in resisting a hostile tender offer for control of the corporation. There is abundant evidence in this case to go to the jury on the state claims for breach of fiduciary duty. I emphatically disagree that the business judgment rule should clothe directors, battling blindly to fend off a threat to their control, with an almost irrebuttable presumption of sound business judgment, prevailing over everything but the elusive hobgoblins of fraud, bad faith or abuse of discretion. I also disagree with the majority's view that misleading and deceptive representations about an offeror's proposal are immunized from the proscriptions of Section 14(e) if the offer is withdrawn before the shareholders have an opportunity to tender.

On the other hand, I agree with the majority that many of the Securities Act misrepresentation claims here represent impermissible transmutations of claims for breach of fiduciary duty into federal securities violations. This result is frequently obtained through allegations that the failure of directors to disclose the culpability of their activities or their improper motives are unlawful misrepresentations. There is, however, at least one clear exception. The jury should have been allowed to consider the company president's public letter of December 20, 1977, claiming a 13% increase in consolidated net income for the nine months ended October 31, when management expected a *decline* in earnings for the full year.

### I.

Addressing first the state law claims of breach of fiduciary duty by the Board, the majority has adopted an approach which would virtually immunize a target company's board of directors against liability to shareholders, provided a sufficiently prestigious (and expensive) array of legal and financial talent were retained to furnish *post hoc* rationales for fixed and immutable policies of resistance to takeover. Relying on several recent decisions interpreting the Delaware business judgment rule, the majority fails to make the important distinction

> between the activity of a corporation in managing a business enterprise and its function as a vehicle for collecting and using capital and distributing profits and losses. The former involves corporate functioning in competitive business affairs in which judicial interference may be undesirable. *The latter involves only*

*the corporation-shareholder relationship, in which the courts may more justifiably intervene to insist on equitable behavior.* Note, *Protection for Shareholder Interests in Recapitalizations of Publicly Held Companies,* 58 Colum.L.Rev. 1030, 1066 (1958) (emphasis supplied).

The theoretical justification for the "hands off" precept of the business judgment rule is that courts should be reluctant to review the acts of directors in situations where the expertise of the directors is likely to be greater than that of the courts. But, where the directors are afflicted with a conflict of interest, relative expertise is no longer crucial. Instead, the great danger becomes the channeling of the directors' expertise along the lines of their personal advantage—sometimes at the expense of the corporation and its stockholders.[1] Here courts have no rational choice but to subject challenged conduct of directors and questioned corporate transactions to their own disinterested scrutiny. Of course, the self-protective bias of interested directors may be entirely devoid of corrupt motivation, but it may nonetheless constitute a serious threat to stockholder welfare. *See* Gelfond and Sebastian at 435–37 (footnotes omitted).

Despite this potential for abuse, the majority relies heavily on the business judgment rule's presumption of good faith in the exercise of corporate decision-making power and attaches special significance to the "independence" of Field's Board. Maj. op. *ante* at 294.[2] The fact that Field's may have had a majority of non-management (independent) directors is hardly dispositive. The interaction between management and board may be very strong even where, as here, a relationship of symbiosis seems to prevail over the normal condition of "management domination."[3] Whether the relationship is symbiotic or management "dominates," I do not think it necessary to rely primarily on such directly pecuniary relationships as one director's senior partnership in Field's investment banking firm (although this was admittedly a quite profitable arrangement) or another director's ownership of stock in a Field's depository bank (obviously a more attenuated interest) to establish a conflict of interest here. These factors deserve appropriate attention. But the very idea that, if we cannot trace with precision a mighty flow of dollars into the pockets of each of the outside directors, these directors are necessarily disinterested arbiters of the stockholders' destiny, is appallingly naive.

Directors of a New York Stock Exchange-listed company are, at the very least, "interested" in their own positions of power, prestige and prominence (and in their not inconsequential perquisites).[4]

1. Hostile tender offers unavoidably create a conflict of interest.... Nearly all directors and managers are interested in maintaining their compensation and perquisites.... [A] hostile tender offer unavoidably involves forces tending to shape decisions that are not necessarily for the benefit of all shareholders. As a result a ... business judgment approach in hostile tender offer cases is inappropriate.
Gelfond and Sebastian, *Reevaluating the Duties of Target Management in the Hostile Tender Offer,* 60 B.U.L.Rev. 403, 435–37 (1980) (hereinafter "Gelfond and Sebastian").

2. "In practice [and presumably regardless of its numerical composition], the American corporation's board of directors is largely dominated by the management of the corporation." Gelfond and Sebastian at 436. I recognize, however, that plaintiffs here have not sought to prove that management "controlled" the Board. Appellee's Br. at 78.

3. In *Mite Corp. v. Dixon,* 633 F.2d 486 (7th Cir. 1980), this court invalidated a provision of the Illinois Business Take-Over Act, Ill.Rev.Stat. ch. 121½, § 137.51 *et seq.* (1979), which provided for a hearing on the equity of a tender offer by the Illinois Secretary of State at the request of "a majority of the directors of the target company who [were] not officers or employees of the target company...." We there said that this provision was apparently not *intended* to give incumbent management the right to require hearings. Nonetheless, we said of this procedure that, "It still seems likely that in a significant number of cases management will be able to use the provision ... through its ability to influence outside directors." *Mite,* 633 F.2d at 494–95.

4. Apart, of course, from the very substantial salaries of the "inside" (management) directors and the benefits to certain outside directors, noted *supra,* all the outside directors had annu-

They are "interested" in defending against outside attack the management which they have, in fact, installed or maintained in power—"their" management (to which, in many cases, they owe their directorships). And they are "interested" in maintaining the public reputation of their own leadership and stewardship against the claims of "raiders" who say that they can do better. Thus, regardless of their technical "independence," directors of a target corporation are in a very special position, where the slavish application of the majority's version of the good faith presumption is particularly disturbing.

Under the business judgment rule, once a plaintiff demonstrates that a director had an interest in the transaction at issue, the burden of proof shifts to the director to prove that the transaction was fair and reasonable to the corporation. *Treadway Companies v. Care Corp.*, 638 F.2d 357 at 382 (2d Cir. 1980). *Accord, Crouse-Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690 (2d Cir. 1980). There was more than sufficient evidence in the instant case to permit the jury to shift the burden of proof to Field's directors and to consider the reasonableness

of the transactions. The majority here, however, affirms a directed verdict which determines that the evidence was insufficient *as a matter of law* to establish that Field's directors were interested in this transaction. A brief examination of the majority's "overwhelming weight of authority" demonstrates that even these cases do not support its notion of the quantum of evidence necessary to create a jury question in this case.

In *Crouse-Hinds Co. v. InterNorth*, 634 F.2d 690 (2d Cir. 1980), the tender offeror (InterNorth) arrived on the scene *after* a merger of the target (Crouse-Hinds) with a third party (Belden) had been announced. The tender offeror sought to enjoin preliminarily an exchange of stock in furtherance of the merger on the grounds that the exchange was designed merely to perpetuate the target management in office.[5] Even though the target directors were allegedly "interested" in the merger because they would remain in control of the new corporation after its consummation, the court declined to shift the burden of proof to the directors for essentially two reasons.[6]

---

al incomes from Field's which ranged from $11,200 to $16,000 in 1977. Plaintiffs' Exhibit 437.

5. The suit, initially filed by Crouse-Hinds, alleged that InterNorth had violated New York business corporation law and federal securities law and sought an injunction preventing InterNorth from acquiring Crouse-Hinds stock. InterNorth counterclaimed arguing that the "Exchange Offer" which facilitated the merger of Crouse-Hinds and Belden lacked a legitimate business purpose and was unfair to Crouse-Hinds' stockholders. InterNorth sought to enjoin Crouse-Hinds from purchasing Belden stock. The district court subsequently denied Crouse-Hinds' motion to dismiss the counterclaim and granted InterNorth's request for a preliminary injunction. The Court of Appeals for the Second Circuit reversed.

6. The court affirmed the "normal requirement that a complaining shareholder present evidence of the director's interest in order to shift the burden of proof," but rejected the logic of the district court's conclusion that "if the directors are to remain on the board after the merger, perpetuation of their control must be presumed to be their motivation." *Crouse-Hinds*, 634 F.2d at 702. To the extent that this language may have been intended to prevent a

shift in the burden of proof upon a showing that the directors of a target corporation had an interest in maintaining their control of the corporation, I reject the holding as inconsistent with apposite case law, corporate reality and sound public policy. I do not believe, however, that the Second Circuit intended to establish a rule which would preclude an examination of fairness in the instant case. The facts in *Crouse-Hinds* are complicated and special, and the Second Circuit summed up its holding by saying: "In short, when the tender offeror has presented the target company with an *obvious reason* to oppose the tender offer, the offeror cannot, on the theory that the target's management opposes the offer for some other, *unstated*, improper purpose, obtain an injunction against the opposition without presenting strong evidence to support its theory." *Id.* at 704 (emphasis supplied). In the instant case, CHH did not present Field's with an "obvious reason" to oppose the tender offer nor are there alternative reasons "unstated" by plaintiffs here. Further, the *Crouse-Hinds* opinion recites a number of reasons why the InterNorth tender offer might have been inadequate on the merits, including the fact that the offering price was only $40 per share against a closing price the day before the announcement of $38 per share. *Id.* at 694 n.5. When examined from

First, at the time the merger was negotiated, the tender offeror had indicated no interest in the target and, hence, the directors could not have been motivated by a desire to retain control. Second, the tender offer was conditioned on abandonment of the merger and the target company directors' attribution of the exchange of stock to the facilitation of the merger was entirely credible.

Crouse-Hinds is distinguishable from the instant case in at least two respects. First, the Crouse-Hinds/Belden merger, which provided the basis for the self-interest charges, was negotiated *prior* to the tender offer. There was sufficient evidence (independent of any judgment made after the takeover attempt had been announced) to demonstrate that the combination was in the best interest of the stockholders. Thus, any activity to facilitate the merger after the tender offer could legitimately be ascribed to a valid business purpose.

In the present case, however, the challenged board activity occurred *after* CHH made known its acquisitive intentions. The responses of Field's Board could not be justified, as they were in Crouse-Hinds, on documented negotiations and decisions made prior to the tender offer. When reviewed against a background of cast-in-concrete hostility to merger offers, the hasty acquisition of five Liberty House stores in the Pacific Northwest (two of which were acknowledged "dogs"), the $17 million commitment for a Field's store in the Galleria complex in Houston, Texas (the site of a CHH Neiman-Marcus store) and the institution of a major antitrust action within hours of a merger proposal (ostensibly on the mere oral opinion of company counsel) represent some of the facts from which a jury might reasonably conclude that the directors improperly sought to perpetuate their control of the corporation. See pp. 304–310, *infra.*

Crouse-Hinds is also distinguishable from the instant case in that the Crouse-Hinds court as factfinder *did* consider and evaluate the merits of the self-interest claim.[7] The district court and the majority here, however, refuse to allow the jury as factfinder to consider and evaluate any evidence of the directors' self-interest. Thus, Crouse-Hinds cannot legitimately support the affirmance of the directed verdict in the instant case.

The recent decision in *Treadway Companies v. Care Corp.,* 638 F.2d 357 (2d Cir. 1980), is similarly inappropriate authority for the majority's result. In *Treadway,* the tender offeror (Care) challenged the issuance and sale of a substantial number of shares of the target company (Treadway) to a third company (Fair Lanes) on the ground that Treadway's directors improperly approved the sale to perpetuate their control over the corporation.[8] Although the district court denied Care's request for injunctive relief, the court later ruled in Care's favor at the bench trial on the merits and permanently enjoined the voting of the disputed shares. In evaluating the motivation of the Treadway directors, the district court examined "both the manner in which the sale agreement was entered into and negotiated and the ostensible justification for the sale itself." *Treadway,* 638 F.2d at 372. The court was

---

these perspectives, the Second Circuit's digression into the principles of logic does not negate the interpretation of the business judgment rule advocated here.

**7.** Since InterNorth sought injunctive relief, the court was only required to evaluate the likelihood of success on the merits or the existence of a sufficiently serious question going to the merits to make it a fair ground for litigation. *Crouse-Hinds,* 634 F.2d at 701.

**8.** Treadway initially filed the action against Care and Daniel Cowin, Treadway's financial consultant. The complaint alleged that Care and Cowin had unlawfully conspired to seize control of Treadway and sought an order divesting Care of its stock and requiring all defendants to account to Treadway for their profits. Care then counterclaimed seeking an injunction to prevent the issuance and sale of 230,000 Treadway shares to a third company, Fair Lanes. Care claimed that the Treadway Board had breached its fiduciary duty to the shareholders because the sale had been approved primarily to perpetuate the Treadway Board's control of the corporation.

disturbed by: 1) the haste with which the Treadway-Fair Lanes negotiations had been conducted; 2) a consistent effort to structure the proposed transactions to avoid shareholder scrutiny; and 3) the lack of a good faith effort by the Treadway management to determine whether a takeover by Care would or would not be in the best interest of the corporation. *Id.* These factors led the court to conclude that the Board had breached its fiduciary duty by improperly seeking to perpetuate its control.

On appeal, the Second Circuit examined the business judgment rule and explained:

In nearly all of the cases treating stock transactions intended to affect control, the directors who approved the transaction have had a real and obvious interest in it: *their interest in retaining or strengthening their control of the corporation. It is this interest which causes the burden of proof to be shifted to the directors, to demonstrate the propriety of the transactions.* (Citations omitted) ... [Thus,] in attacking a transaction that was intended to affect control, *plaintiff ... bears the initial burden of proving that the directors had an interest in the transaction,* or acted in bad faith or for some improper purpose.

*Treadway,* 638 F.2d at 382 (emphasis supplied). Although the court ultimately found that the Treadway Board had not acted to maintain control, the case does not, for several reasons, require a similar result in favor of Field's directors.

First, the *Treadway* court premised its finding on Care's failure to show that all or even a majority of the directors had a personal interest in having the merger consummated. Only one director (Lieblich) had been promised a position in the merged corporation, and the district court had explicitly found that the other directors expected to lose their board positions if the merger went through. It was therefore reasonable to conclude that the decision to merge was not motivated by the desire of these disinterested directors to perpetuate their control of the corporation. *Treadway,* 638 F.2d at 383.

More importantly, however, the *Treadway* court agreed that "there was ample evidence to support a finding that Lieblich acted improperly and determined, for his own selfish reasons and without giving the matter fair consideration, to oppose a Care takeover at all costs." *Treadway,* 638 F.2d at 383. The fact that the court was unable to attribute Lieblich's improper motives to the other directors or to find that Lieblich dominated the Board does not diminish the conclusion that Lieblich's action was improper. The district court analysis was thus valid insofar as it related to a director who had an interest in maintaining his position as a director.

In the present case, the directors had a personal interest in defeating the takeover attempt—"their interest in retaining or strengthening control of the corporation." *See Treadway,* 638 F.2d at 382. Therefore, under the business judgment rule's burden-shifting doctrine the Board should be required to demonstrate that these transactions were fair and reasonable to the corporation. As in *Treadway,* the haste with which the Board acted in making acquisitions and filing a major lawsuit, the absence of shareholder scrutiny of any of the Board's actions and the apparent lack of a good faith effort to determine whether the takeover was really in the shareholder's best interest are troublesome.

Moreover, the *Treadway* court as factfinder had the opportunity to consider all of the evidence of director self-interest and decide the merits of the fiduciary duty claims. The district court's directed verdict here, however, decided as a matter of law that similar, if not stronger, evidence was insufficient to sustain the charges of self-interested misconduct. Based on *Treadway,* it was surely improper for the district court to take these claims from the jury.

The majority also relies on *Johnson v. Trueblood,* 629 F.2d 287 (3d Cir. 1980) and quotes from Chief Justice Seitz's opinion essentially to establish that self-interest must be the sole or primary motive underlying a director's challenged action rather than merely "a" motive when control is

implicated. The issue arose in *Trueblood*, however, in the context of *how a jury was to be charged*, not whether the evidence should go to a jury at all. The *Trueblood* court concluded (and the majority here agrees) that to survive a motion for a directed verdict, the "plaintiff must make a showing from which a factfinder might infer that impermissible motives predominated in the making of the decision in question." *Id.* at 292–93. Regardless whether "a" self-interested motive is sufficient or whether a "primary" self-interested motive is requisite, there is sufficient evidence in the instant case to satisfy either standard. *See* pp. 304–310, *infra*. Nothing in *Trueblood* supports the view that the district court properly foreclosed jury consideration of the claims of Field's shareholders.

Beyond this, however, I believe that Judge Rosenn's dissent in *Trueblood* states the proper interpretation of the business judgment rule in control cases: "Once a plaintiff has shown that the desire to retain control was 'a' motive in the particular business decision under challenge, the burden is then on the defendant to move forward with the evidence justifying the transaction as primarily in the corporation's best interest." *Trueblood*, 629 F.2d at 301. This statement of the rule is compatible with both the Delaware case law [9] and the realities of corporate governance, and is by no means a minority position. In *Klaus v. Hi-Shear Corp.*, 528 F.2d 225 (9th Cir. 1975), the logic of which the defendants ignore and the majority chooses to reject, the Court of Appeals for the Ninth Circuit approved the application of a rigorous rule which required directors of a target company, as fiduciaries, to demonstrate a "compelling business purpose" for their actions. *Id.* at 233–34. The *Klaus* standard is entirely consistent with the standard which the Second Circuit clearly spelled out in *Treadway* and left intact in *Crouse-Hinds*. *See* note 6, *supra*. *See also Podesta v. Calumet Indus. Inc.*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,433 (N.D.Ill. 1978); *Royal Indus., Inc. v. Monogram Indus.*, [1976–77 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 95,863 (C.D.Cal.1976).

Thus, the majority here has no basis for asserting that in "control" cases an interpretation of the business judgment rule which shifts the burden of proof to interested directors and requires them to establish a valid business purpose for their actions is a "novel" rule contrary to the "overwhelming weight of authority." [10] In none of the cases cited by the majority was the factfinder (whether judge or jury) precluded from evaluating the merits of the fiduciary duty claims. In the instant case, on the other hand, similar claims are buffered against jury examination by the *cordon sanitaire* of a distorted business judgment rule.

## II.

The basic error of the majority in the instant case is in holding as a matter of law that there was insufficient evidence to go to the jury on the state claims of breach of

---

**9.** Nothing in *Bennett* [*v. Propp*, 41 Del.Ch. 14, 187 A.2d 405 (1962)] or *Cheff* [*v. Mathes*, 41 Del.Ch. 494, 199 A.2d 548 (1964)] suggests that the plaintiff must first prove that the sole or primary purpose of the transaction was the directors' desire to retain control over the corporation. Rather, the unequivocal thrust of *Bennett* is that once the record demonstrates that control is implicated in the transaction, a conflict of interest is *ipso facto* created. Once a conflict of interest is present, the burden of proof is shifted logically and pragmatically on the defendants 'to justify [the transaction] as one primarily in the corporate interest.' *Bennett, supra*, 187 A.2d at 409.

... Recent Delaware cases reveal a growing trend to impose obligations on manage-

ment to justify control-related transactions. *Cf. Singer v. Magnavox*, 380 A.2d 969 (Del. 1977) ... *Sinclair Oil v. Levien*, 280 A.2d 717, 720 (Del.1971) ... *Petty v. Penntech Papers, Inc.*, 347 A.2d 140, 143 (Del.Ch.1975). *Trueblood*, 629 F.2d at 300–01 (Rosenn, J., dissenting).

**10.** Another case which figures prominently in the majority's discussion of the Delaware business judgment rule is *GM Sub Corp. v. Liggett Group, Inc.*, No. 6155 (Del.Ch. April 25, 1980). Except for the fact that this unpublished preliminary ruling by a Delaware trial court makes a passing reference to the district court opinion in the instant case, *GM Sub Corp.* has little relevance to the claims of Field's shareholders.

fiduciary duty. In reviewing a directed verdict, this court must evaluate the evidence in a light most favorable to the appellant and determine "whether it is of sufficient probative value that members of the jury might fairly and impartially differ as to the inferences to be reasonably drawn therefrom." *Hohmann v. Packard Instrument Co.*, 471 F.2d 815 (7th Cir. 1973). *See also Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980). There was abundant evidence from which a jury in this case could have concluded that Field's directors breached their fiduciary duties to the shareholders: 1) by pursuing a fixed, nondebatable and undisclosed policy of massive resistance to merger with, or acquisition by, a series of the nation's foremost retailers; 2) by making hasty and apparently imprudent defensive acquisitions to reduce Field's attractiveness as a takeover candidate and to force the withdrawal of the CHH offer; and 3) by hastily filing a major antitrust suit to further impair persistent acquisitive efforts of CHH.

Reviewing first the evidence on the existence of a policy of independence in a light most favorable to appellants, it is difficult to understand the basis for the majority's conclusion that jurors could not fairly and impartially differ as to the inferences to be drawn from the facts presented. *See Hohmann*, 471 F.2d at 820. Marshall Field's Board of Directors had long been aware of the fact that the company's "accumulated worth, strong balance sheet, large cash reserves and borrowing potential" made Field's vulnerable to an involuntary merger or takeover. *Panter v. Marshall Field & Co.*, 486 F.Supp. 1168 (N.D.Ill.1980). In December 1969, at approximately the same time that Associated Dry Goods expressed an interest in acquiring Field's, the Board retained Joseph Flom of the New York law firm of Skadden, Arps, Slate, Meagher & Flom for advice on defeating takeover bids. *Id.* at 1175–76. Flom recommended the application of his "pyramid theory" which is based on the principle that the best way to remain independent is to acquire other enterprises.[11] In this way, Field's would either become too large to be acquired or would have so much overlap that acquisition of Field's by another major retailer would inevitably create antitrust problems.

While the majority notes that Flom advised the Board to be interested and listen carefully to proposals from other retailers, the majority apparently overlooks the curious coincidence that Field's made a major acquisition and/or raised antitrust problems to fight off virtually every serious merger or takeover attempt after the company hired Flom. *See* maj. op. *ante* at 278. In response to the interest of Associated, a predominantly Ohio and Pennsylvania operation, Field's conveniently acquired the Cleveland and Erie retail operations of Halle Brothers. *Panter*, 486 F.Supp. at 1177. These stores have, however, been less than profitable for Field's in the decade since they were acquired. *See* Plaintiffs' Exhibits 370, 372.

Similarly, after a merger proposal from Federated Department Stores in 1975, Field's actively employed Flom's antitrust approach to prevent a takeover. Record at 2101–03. No major acquisition was necessary in this instance because Federated's Chicago Division of I. Magnin and the Chicago, Seattle, and Milwaukee-based Boston Stores (which Federated offered to divest[12])

---

11. Flom testified that he advised every Field's Chief Executive from 1970 to 1977 that acquisitions were the best means to prevent takeover. *Panter*, 486 F.Supp. at 1176.

12. Much of the documentary evidence relating to merger or tender offer proposals prior to the CHH offer was excluded by the district court on relevance grounds. Rule 401 of the Federal Rules of Evidence defines relevant evidence as anything which has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Plaintiffs here sought to establish the existence of a fixed and pervasive policy of independence which prompted the board to actively resist any CHH proposal regardless of its merit. I believe Judge Will, who made several preliminary rulings in this case, correctly defined the parameters of relevant issues for trial when he said, ". . . the world didn't start on October 12, 1977 [the day CHH first expressed an interest in Field's]. The only way to interpret [sic] what happened from October

created sufficient antitrust leverage for Field's to stave off the unwelcome opportunity. Again, in 1976, Field's was under siege by Dayton-Hudson, but sought to acquire overlapping stores in Portland, Oregon and Tacoma, Washington from Liberty House.[13] Although Field's Board vociferously contends that its fascination with the Pacific Northwest was part of a long-range plan to sustain growth and profitability, the Board's interest in the Liberty House stores coincidentally subsided as Dayton-Hudson's interest in Field's waned. *See Panter*, 486 F.Supp. at 1177. Finally, it should surprise no one that Field's initial response to the CHH proposal was to raise antitrust questions and hastily seek to acquire retail operations which were adjacent to CHH operations. *See* pp. 306–312 *infra*.

The majority accepts the defendants' claim that the Board's responses were tailored to a "desire to build value within the company and the belief that such value might be diminished by a given offer." Maj. op. *ante* at 296.[14] But one man's desire to "build value" may be another man's desire to "keep control at all costs," and a jury must decide which characterization is most consistent with the facts. A properly charged jury could have fairly concluded that Field's carefully weighed each merger or takeover offer to determine stockholder interest, but they could have just as fairly concluded that Field's careful-

ly built its defenses against each offer without regard to stockholder interest. A directed verdict on these claims is therefore indefensible.

The plaintiffs also presented extensive evidence to substantiate their claims that Field's Board gave the CHH merger proposal no bona fide consideration and instead engaged in classic anti-takeover maneuvers. Throughout the busy Christmas season, the Board hastily solicited and apparently imprudently consummated several defensive acquisitions to reduce the company's attractiveness as a takeover candidate, create additional antitrust problems and ultimately force the withdrawal of the CHH offer. The documentary and testimonial evidence presented at trial provided a sufficient basis from which a jury could conclude that Field's Board in this respect breached its fiduciary duty.

The Board first learned of the CHH interest at a meeting following the death of Field's then chief executive, Joseph Burnham, in October 1977. *Panter*, 486 F.Supp. at 1178. A resolution passed at that meeting announced the Board's swift and uncompromising response: "The proposed business combination *should not be considered* because the best interests of the company's shareholders would be served by ... continuing as an independent entity." *Id.* (emphasis added). When CHH presented a formal merger proposal to the Board

---

12, 1977 to February ... 22nd, when the [CHH] offer [was] withdrawn, is to look at what happened before." Hearing of 3/27/79, Record at 10–11 (emphasis added). Far from being irrelevant "collateral" material, much of the excluded evidence discloses facts which tend to make the existence of a policy of independence "more probable ... than it would be without [that] evidence," and therefore was improperly withheld. Even in the absence of this evidence, however, I think the plaintiffs established a sufficient factual basis for a jury determination of the state claims.

**13.** When asked to examine the antitrust aspects of a Dayton-Hudson/Marshall Field's combination, William Blair & Co., Field's investment banker, could find no competitive overlap between the two retailers. However, in a letter dated August 5, 1976, a Blair representative commented:

... it could be that Marshall Field itself has acquisition thoughts which, if consummated, could result in direct overlap or conflict and conceivably could be the basis for anti-competitive considerations. We suggest that your management give careful review to any acquisition thoughts resulting in entry into new markets by Field's. To the extent that such expansion is a real possibility, it could at some point have a bearing on a consolidation with a company such as Dayton-Hudson. Plaintiffs' Exhibit 61. This piece of evidence, however, was improperly excluded at trial. *See* note 12, *supra*.

**14.** There seems to be a striking paucity of evidence on how value might have been "diminished by a given offer." For the most part, Field's managed to squelch these offers before their impact on value could be fully appreciated by its stockholders.

on December 12, 1977, the directors received a limited review of the financial aspects of the merger,[15] heard conflicting reports on Marshall Field's future earnings,[16] and rejected the CHH proposal as "illegal, inadequate and not in the best interest of Marshall Field & Co., its stockholders and the community which it serves." *Id.* at 1181.

Less than two weeks later (and only four days before Christmas), a committee of Field's officers and investment bankers reviewed a list of candidates available for immediate acquisition by Field's. Record at 553. Within ten days of this meeting, committee members met with the principal stockholders of Dillard's, a southwestern retailer in direct competition with CHH's Neiman-Marcus division, to see if a deal could be struck.[17] Record at 555–57. Correspondence from one of Field's investment bankers established that the Board sought a speedy transaction which would not require shareholder approval.[18] Because there was no time for a full scale financial analysis, the banker relied on "the intuitive judgment [of a Field's officer] as to the business potential" of the acquisition. Plaintiffs' Exhibit 137. The deal ultimately fell through, however, when Dillard's was purchased by Dutch interests. Record at 578–79.

Shortly after the demise of the Dillard's deal, Field's Board considered a proposal to acquire five Liberty House stores in the Pacific Northwest.[19] In the absence of any

15. Field's investment bankers were never asked to evaluate the adequacy or the fairness of the CHH proposal or determine the range for an acceptable offer. Record at 2275–76. The record only shows that Mr. Flom asked whether "it [was] reasonable to assume that if the Marshall Field Board chose to sell the company now, it could expect to attain a higher price than that proposed by CHH? The response was yes; [but] no price was specified." Plaintiffs' Exhibit 122.

16. The investment bankers' "best professional judgment" was that Field's future earnings would rise 15% in 1978 and 12% each year thereafter. Plaintiffs' Exhibit 122; Record as 2309–10. However, Field's President Angelo Arena, who had been on the job less than two months, presented a hastily prepared "five-year plan" which projected an earnings per share increase of 23% for 1978 and approximately 20% for each year thereafter. The plan also showed that Field's management expected the 1977 earnings (year ending January 31, 1978) would be down some 7% from the prior year, but anticipated a five year increase of up to 193% in Field's per share earnings despite the fact that in the prior five years, Field's per share earnings had declined by 20%. Plaintiffs' Exhibits 122, 413E. The Board rejected the bankers' estimates in favor of Arena's five-year plan. Plaintiffs' Exhibit 122; Record at 2314–17.

17. The December 21, 1977 Acquisition Status Report indicates that less than two weeks prior to the meeting with Dillard's shareholders, Field's officers did not even know whether Dillard's was a standard retailer or a discount operation. Plaintiffs' Exhibit 130.

18. The January 4, 1978, letter from a representative of William Blair & Co. to Field's Executive Vice-President stated:

The most important benefits to Marshall Field & Co. from an all cash transaction are as follows:

*The speed of consummation*, since the approach will not require the filing of a registration statement and, since it would be a friendly offer endorsed by Dillard management, it would not run afoul of anti-takeover laws *nor would there be a need for a stockholders meeting* by either company.

\* \* \* \* \* \*

... The principal disadvantages of [a tax-free transaction] are the *time required to effect the total transaction* (registration and stockholders meetings) and the *risk of certain Field's stockholders throwing up roadblocks* to the transaction....

Plaintiffs' Exhibit 137 (emphasis supplied).

19. Defendants claim that the acquisition of these Liberty House stores was the fruit of a long-standing desire to expand its Seattle-based Frederick and Nelson division. They point to 1975 and 1976 visits to these locations as proof of their good intentions. They conveniently ignore two important facts, however: 1) in 1975 and 1976 when these visits were made, Field's was fighting off takeover attempts by Federated and Dayton-Hudson, respectively; and 2) a December 1, 1977, letter from John Nannes of Skadden, Arps to Joseph DeCoeur of Kirkland & Ellis suggests a Liberty House acquisition would bolster Field's potential competition theory:

Dear Joe:

The Wall Street Journal reported in November 25, 1977 (page 14, column 6), that Carter Hawley Hale acquired a Liberty House department store in San Jose, California from Amfac, Inc. I understand that there are a number of Liberty House department stores in the Pacific Northwest, and this may well bolster our potential competition theory.

historical operating data,[20] and despite reports from Field's Vice-President of Corporate Development that the estimated earnings potential of these stores was marginal,[21] the Board unanimously approved a $24 million agreement to purchase these operations. Record at 603. The acquisition was publicly announced the following day. Plaintiffs' Exhibit 154.

Field's Board supplemented its sudden interest in acquiring operating retail stores with a hasty investigation of opportunities for expansion in two major shopping centers. While members of the acquisition team were concentrating on Dillard's, Field's Vice-President in charge of real estate was assigned to negotiate with Homart Development Corporation, managers of Northbrook Court in Chicago's northern suburbs. Although the Board had rejected an earlier plan to develop a Field's store in this shopping center,[22] their renewed interest could be credited to the fact that Nieman-Marcus had a successful operation in the same location.[23] The center was designed to contain four anchor stores, and Homart had commitments from four major tenants. The Field's representative pressed for the creation of a fifth anchor, but the negotiations ultimately fell apart. Record at 391–92.

The Board was more successful in its efforts to acquire space in the Galleria, an exclusive shopping center in Houston, Texas (and, of course, the location of another Neiman-Marcus store). In less than a month, Field's Board received an initial presentation on the Galleria,[24] authorized negotiations for a lease [25] and approved a $17 million dollar commitment to establish the first Marshall Field's store outside the Chicago area.[26] The letter of agreement between Field's and the Galleria management was signed one day after CHH made a formal tender offer to purchase Field's stock at $42 per share. The agreement was announced on February 8, 1978, and shortly thereafter, CHH withdrew its offer because Field's expansion program [27] had "created sufficient doubt about Marshall Field's earning potential to make the offer no longer in the best interest of CHH shareholders." Plaintiffs' Exhibit 345.

The majority reviewed this sequence of events and concluded that there was "uncontroverted evidence that such expansion was reasonable and natural." Maj. op. *ante* at 297. There was more than sufficient evidence here, however, for a jury to conclude that it was not "reasonable and natural" for the directors of a major retailer to make expansion commitments totalling more than $40 million dollars during and shortly after a busy Christmas season in which their "top priority" was to help a new chief executive officer become familiar with Field's operation.[28] Particularly when con-

---

Plaintiffs' Exhibit 109. This letter was written *before* CHH ever made a formal merger proposal which Field's Board could consider.

**20.** *See* Record at 668–69.

**21.** The figures prepared by Field's Vice-President of Corporate Development were rejected by Field's management and replaced with more optimistic estimates dated January 19, 1978, the day of the Board meeting at which the Liberty House acquisition was approved. *Cf.* Plaintiffs' Exhibit 148 (figures of Vice-President of Corporate Development) with Plaintiffs' Exhibit 151 (figures used in replacement report).

**22.** In 1975, Field's management decided not to move into Northbrook Court because Field's already had stores nearby at the Old Orchard and Hawthorn shopping centers. Record at 3200–01.

**23.** The antitrust complaint filed by Field's relied heavily on the competitive overlap between the Neiman-Marcus Northbrook Court store and Field's Chicago stores. Plaintiffs' Exhibit 195B.

**24.** Record at 1937.

**25.** Plaintiffs' Exhibit 285.

**26.** Plaintiffs' Exhibit 290.

**27.** Field's also announced in February 1978 that it had commenced negotiations for a store in the North Park Mall in Dallas, Texas. Plaintiffs' Exhibit 169. Dallas is the headquarters of CHH's Neiman-Marcus division, and North Park Mall is the site of a Nieman-Marcus store.

**28.** At one point during the trial, Director William Blair testified that the Board's "top priority" was to help Arena in the transition period following Burnham's death "because without capable management at the top of the company

sidered with the evidence of a long-standing and uncompromising policy of independence, I am astonished that the business judgment rule under any guise could keep this case from the jury.

Finally, the plaintiffs presented sufficient evidence to survive a directed verdict on the claim that Field's directors breached their fiduciary duty to the shareholders by filing a major antitrust suit against CHH within hours of the receipt of CHH's first merger proposal. The majority here has concluded that the defendants were "fairly and reasonably exercising their business judgment to protect the corporation against the perceived damage an illegal merger could cause." Maj. op. *ante* at 297. Once again, however, the facts presented at trial could easily support a quite different conclusion.

CHH President Philip Hawley informed Field's President, Angelo Arena, on December 10th that CHH intended to make a formal merger proposal within two days unless Field's agreed to enter serious negotiations with CHH representatives. Record at 1341. Arena then hastily assembled one director, one officer and several of Field's investment bankers and lawyers in New York on Sunday, December 11th at an emergency meeting. *Panter*, 486 F.Supp. at 1180; Record at 457–59, 2861–62. Although Arena had privately solicited an opinion on the antitrust implications of a merger with CHH from Kirkland & Ellis, no Kirkland & Ellis representative attended the meeting. Record at 459. Arena reported, however, that he had received oral con-

firmation from a Kirkland attorney that the proposed merger was illegal. *Panter*, 486 F.Supp. at 1181. Two prominent law firms representing CHH had also reviewed the matter and believed an adequate agreement could be worked out to avoid any antitrust problems.[29] *Id.* at 1180. However, without written legal analysis and without further discussion, the emergency anti-takeover cabal agreed that Field's would file an antitrust suit against CHH and solicit investigatory action by the FTC,[30] the SEC and the Illinois Securities Commission[31] to help block the merger. Arena then called each director not present at the meeting, briefly outlined the antitrust problem and obtained authorization to file the suit. *Id.* at 1181. The following day, the Board issued a press release announcing the merger proposal and stating that a suit had been filed. Plaintiffs' Exhibit 113.

A jury considering this evidence could have found that Field's Board failed to adequately review the legal aspects of the proposed merger with CHH. In addition to hastily approving a lawsuit arguably based on insubstantial antitrust claims (involving quite remediable problems), the Board made defensive acquisitions which bolstered those claims, drained Field's of cash and ultimately led to the withdrawal of the CHH offer. The jury could have concluded that the directors in a sense used Field's own assets against the shareholders to defeat the takeover proposal of a high quality retailer which essentially doubled the market price of Field's stock.[32] With these

as our Christmas season was starting, we *would have been in trouble and the stockholders would have suffered.*" Record at 3021.

**29.** The CHH proposal received by the Board on December 12, 1977, stated, "Our counsel have considered the antitrust aspect of the combination. They believe that the proposed transaction would be lawful and we will act on the basis of that advice." Plaintiffs' Exhibit 111.

**30.** Kirkland & Ellis initiated the FTC investigation, but no formal action or complaint was ever filed against CHH. Plaintiffs' Exhibit 441.

**31.** Kirkland & Ellis also asked the Illinois Securities Commission ("ISC") to file suit against

CHH for violations of the state securities laws. Although Kirkland attorneys prepared a draft complaint and submitted it to the ISC, the Commission refused to take any action. Plaintiffs' Exhibits 196, 441.

**32.** The fair market value of Marshall Field & Co. stock in the period December 1977—February 1978 was $18–20 per share. The actual price of Field's stock on the New York Stock Exchange increased from about $19–20 per share in September 1977 to just under $23 on December 9, 1977. On December 14, 1977, when trading resumed after being suspended in light of the CHH $36 merger announcement, the price of Field's stock jumped to about $32.

findings, a jury charged even under the defendants' version of the business judgment rule could have decided the case for plaintiffs.

One may, of course, argue that what the directors did here was merely to make the normal reflexive response of incumbent management to efforts by outsiders to take over control of a corporation. In fact, applicable federal and state takeover legislation suggests that incumbent management—protective of its own powers and perquisites—may almost automatically attempt to defeat hostile tender offers, whatever their merits.[33] These assumptions may reflect a realistic view of human and corporate nature, and perhaps the law should simply excuse directors for thinking of themselves first and stockholders second in the event of a threatened takeover. In that regard I do not perceive the actions of Field's directors here as necessarily more egregious than many others in like circumstances. But under the legal norms which now must guide us (and no matter who has the burden of proof), there is no good reason to take this unfortunately too typical, but nonetheless important and substantial, case from the jury.

### III.

In addition, I disagree with the majority's conclusion that, because the CHH tender offer was withdrawn before plaintiffs had the opportunity to decide whether or not to tender their shares, any deception which Field's Board might have practiced cannot be a violation of Section 14(e) of the Williams Act. Maj. op. *ante* at 283–285.

The type of rule which the majority advocates is simply an invitation to incumbent management to make whatever claims and assertions may be expedient to force withdrawal of an offer. Management could speak without restraint knowing that once withdrawal is forced there is no Securities Act liability for deception practiced before withdrawal took place. Such a rule provides a major loophole for escaping the provisions of Section 14(e) and obviously frustrates the remedial purpose of the Act.

"*It is well settled that [s]tatements made by either the offeror or the target company prior to the actual effective date of a tender offer but after the announcement of the offer and preliminary filings fall within the purview of § 14(e). . . .* During this interim period the policies behind Section 14(e) apply with as much force as they do following the effective date of the offer." *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1318 (W.D.Mich.1978) (footnotes omitted and emphasis added). The management of a company subject to a tender offer proposal is in a unique position to take steps and make representations that may have a significant impact on the likelihood that the proposal will be frustrated. For example, in the instant case, Field's undertook a hasty acquisition program which may have made Field's significantly less attractive and contributed to the withdrawal of the proposal. Admittedly, this was a course of action rather than primarily a course of representation—but the effect of the latter could be the same.

Compelled by the logic of its position that Section 14(e) provides no protection with

---

In the next six weeks the price ranged from the high $20's to the low $30's. After the February 1, 1978, $42 tender offer announcement, the price of Field's stock increased to a high of over $35 and stayed in the high $20's and low $30's until February 22, 1978 when the price plunged to $19⅞ with the announcement of the withdrawal of CHH's offer. Plaintiffs' Exhibit 510.

**33.** In the debate on the Senate floor leading to enactment of the federal takeover disclosure statute, Senator Harrison Williams (its author) said:

I have taken extreme care with this legislation to balance the scales equally to protect the legitimate interests of the corporation, management, and shareholders without unduly impeding cash takeover bids. Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of the offeror. The purpose of this bill is to require full and fair disclosure for the benefit of stockholders while at the same time providing the offeror and management equal opportunity to fairly present their case.

113 Cong.Rec. 854–55 (1967), *quoted in Mite*, 633 F.2d at 496 n.22.

respect to offers which are withdrawn before stockholders have an opportunity to tender, the majority also concludes that Section 14(e) does not apply to decisions not to sell into markets which are rising on news of a tender offer announcement. But in *Gerber v. Berman Products Co., supra,* the court said that claims based on the interim market price of stock were actionable even where a proposed tender offer is withdrawn without becoming effective:

> The requisite causation does exist, however, to the extent that [shareholders] were misled into retaining their holdings when they could have sold them on the market at a higher price. The legislative history of the Williams Act indicates that the legislation was intended to reach such transactions as well as those involving the actual tender of a stockholder's shares.... If [the board of directors] misrepresented or omitted material facts in connection with their opposition to the [tender offer] proposal so that [the shareholders] were induced to retain their shares in reliance upon the integrity and good judgment of the board of directors, but had they known the truth they would have sold their stock in the rising market, a direct causative link exists between [the board of directors'] acts and [the shareholders'] investment decision.

*Berman,* 454 F.Supp. at 1325.

The majority places heavy reliance on *Lewis v. McGraw,* 619 F.2d 192 (2d Cir.) (per curiam), *cert. denied,* —— U.S. ——, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980) where the Court of Appeals for the Second Circuit dismissed the stockholders' Section 14(e) claim for failure to establish reliance or causation. There a tender offer, conditioned on the approval of target management, never became effective because the board of the target corporation rejected the proposal. The district court in *Lewis* concluded that the complaint sufficiently alleged deception "in connection with the tender offer" because "the prospective offeror [had] made a public announcement of a proposed tender offer and [plaintiff had alleged] a clear and definite intent to make a tender offer." *Lewis v. McGraw,* [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,195, 96,568 (S.D.N.Y.1979). Although the complaint was dismissed for failure to allege causation and reliance, the district court emphasized that "it would be inconsistent with the purpose of Section 14(e) to preclude an action for damages relating to pre-tender offer violations in cases where no tender offer was in fact made. Such [a rule] would have the effect of providing a safe harbor for target companies who were successful in their use of misstatements or deception to discourage the making of tender offers." *Id.* at 96,568. I find the district court's mode of analysis reflective of the economic realities of the situation and consistent with the thrust of prior case law. *See Berman v. Gerber Products Co., supra; Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145 (S.D.N.Y.1977).[34] If, therefore, *Lewis* is to be construed as the majority would have it here, I am quite unpersuaded by what would seem to be the Second Circuit's unexplained and summary departure from a well-established line of analysis.

But, as the Securities and Exchange Commission in its *amicus curiae* brief in the instant case points out:

> The *Lewis* opinion [by the Second Circuit] ... addressed only the question whether protection was afforded against deception that operates to prevent a tender offer from becoming effective and thus deprives shareholders of the opportunity to make a decision whether to tender their shares.... [T]he *Lewis* opinion [does not address] the different question presented here, of whether shareholders are afforded protection from deception that influences investment decisions which they do in fact make after a tender offer proposal is publicly announced.

---

**34.** "When ... a public announcement of a proposed offer has been made, the very dangers that the Act was intended to guard against come into play, and the application of section ... 14(e) is thus appropriate." *Applied Digital,* 425 F.Supp. at 1155 (footnote omitted).

SEC Supplemental Br. at 11–12. This distinction (between loss of the tender offer itself and loss of the opportunity to sell at rising prices induced by the tender offer proposal) is clear and realistic. If there was deception in the present case, then many Field's shareholders could have failed to sell their stock at the high prices induced by the tender offer announcement because they were deceived. From the perspective of a public shareholder, once announcement of a tender offer proposal is made, it matters little whether fraud occurs before or after shareholders are given the opportunity to tender to the bidder, or whether they are ever given that opportunity. A shareholder, who, in the face of a proposed tender offer elects not to sell into the market in reliance on management's misleading statements, is in a position similar to that of a shareholder who elects not to tender to the bidder in reliance upon such statements. Congress clearly protected the latter, as well as, I believe, the former.

## IV.

Without attempting to analyze all the statements alleged in this case to be false or misleading, I address only the letter from Field's president to its shareholders dated December 20, 1977. In this letter the president reported consolidated net earnings for nine months ended October 21 to be up 13% without adverting in any way to his expectation (evidenced in a five-year plan just submitted to the Board) that consolidated net earnings for the year would decline by 6½%. Thus it was fully expected that there would be a *drop* in annual earnings from $2.01 to $1.86 per share. In fact, earnings for the year turned out to be $1.76 (down 25%). Having disseminated glowing generalities about the future, citing interim financial figures, defendants had the duty to disclose the anticipated, though unpleasant, immediate expectations of management. *See First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir. 1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1979). The majority finds this very questionable communication to be so far from deceptive or misleading as not to require its submission to the jury.

By way of defending its conclusion, the majority argues that it was clear from the context of the letter that unprofitable ventures would turn the year-to-year comparison distinctly unfavorable. Maj. op. *ante* at 291–292, note 5. I think it just as rational to interpret the letter as saying that, but for the sour undertakings, the nine-month numbers would be even better. The majority also defends its conclusions by arguing that, since the internal estimates were not precise, it was better to leave the public with an upbeat nine-month impression than to suggest that the full year would be down, although no one knew exactly how much. Maj. op. *ante* at 292–293. But this defense ignores the fact that management's pitch to the shareholders was bolstered by three-quarter figures which the managers then believed to be unrepresentative of the full year. Whatever may have been management's (perhaps perennial) hope that "there [was] light at the end of the earnings' tunnel" (maj. op. *ante* at 291–292, note 5), this misleading use of the numbers created a serious question for the jury.

## V.

To have taken this close case presenting a wide range of defensible inferences from the jury is a major disservice to stockholders everywhere. This case announces to stockholders (if they did not know it before) that they are on their own and may expect little consideration and less enlightenment from their board of directors when a tender offeror appears to challenge the directors for control. I believe that only the submission to jury verdict of cases like this one can restore confidence in our system of corporate governance. While I concur as to many of the Securities Act deception claims, I must respectfully dissent in the areas which I have indicated.

Cudahy, J., dissenting.